**IN THE HAMILTON COUNTY COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

| | | |
|---|---|---|
| Dr. Cindy Lee | : | CASE NO. _____ |
| 9120 Hoffman Farm Lane | : | |
| Cincinnati, Ohio 45242 | : | JUDGE _____ |
| | : | |
| **and** | : | |
| | : | |
| Dr. C.T. Lee | : | |
| 9120 Hoffman Farm Lane | : | |
| Cincinnati, Ohio 45242 | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **JURY DEMAND ENDORSED** |
| v. | : | **HEREON** |
| | : | |
| Goodville Mutual Casualty Co. | : | |
| 625 West Main St., P.O. Box 489 | : | |
| New Holland, PA 17557-0489 | : | |
| | : | |
| **and** | : | |
| | : | |
| Claim-Net, LLC | : | |
| 4190 N. State Road 39 | : | |
| Lebanon, Indiana 46052 | : | : |
| | : | |
| **and** | : | |
| | : | |
| Dennis Hester | : | |
| 4190 N. State Road 39 | : | |
| Lebanon, Indiana 46052 | : | |
| | : | |
| **Defendants.** | : | |

## **COMPLAINT**

For their Complaint against Defendants Goodville Mutual Casualty Co. ("Goodville"), Claim-Net, LLC ("Claim-Net"), and Dennis Hester ("Mr. Hester") (collectively "Defendants"), Plaintiffs Dr. Cindy Lee and Dr. C.T. Lee ("Plaintiffs") state and aver as follows:

## NATURE OF THE ACTION

1.      This is an action for bad faith, breach of an insurance contract, negligent misrepresentation, fraud, and promissory and/or equitable estoppel arising out of Defendants' bad faith in handling Plaintiffs' fire loss claim involving the apartment complex located at 500 Williams Street, Cincinnati, Ohio 45215 (the "Property"). A copy of the insurance policy at issue is attached as Exhibit A.

## JURISDICTION

2.      Personal jurisdiction and venue are established because Plaintiffs are residents of Hamilton County, Goodville issued an insurance policy insuring the Property located in Hamilton County, Defendants engaged in business in Hamilton County, Defendants and/or their agents acted in bad faith and/or made misrepresentations to Plaintiffs in Hamilton County, and/or the loss at issue occurred in Hamilton County.

3.      This Court has subject matter jurisdiction over this action because the amount in controversy is in excess of $25,000.00.

## THE PARTIES

4.      Plaintiffs Cindy Lee and C.T. Lee are residents of Hamilton, County, Ohio and the owners of the Property at issue.

5.      Goodville is an insurance company with its principal place of business in New Holland, Pennsylvania.

6.      Claim-Net is an insurance claims adjustment and field investigation company with its principal place of business in Lebanon, Indiana.

7.      Mr. Hester is an Indiana resident and the owner and/or manager of Claim-Net.

8.      Upon information and belief, Goodville hired Claim-Net and/or Mr. Hester to provide adjustment services relating to Plaintiffs' loss at issue.

9.      Upon information and belief, at all relevant times, Claim-Net and/or Mr. Hester were acting within the scope of their employment and/or agency with Goodville.

10.     Upon information and belief, at all relevant times, Mr. Hester was acting within the scope of his employment and/or agency with Claim-Net, and the various employees and/or contractors of Goodville were acting within the scope of their employment and/or agency with Goodville.

## FACTS RELEVANT TO CLAIMS

11.     The Property was a 12-unit, 3-story apartment complex located in Cincinnati, Ohio.

12.     At all relevant times, Plaintiffs were the owners of the Property and rented out the vast majority of the Property to tenants.

13.     Plaintiffs purchased an insurance policy from Goodville covering the Property with coverage limits of $818,000 in the event of a "peril," which included a fire.

14.     Plaintiffs dutifully and timely paid premiums to Goodville for the policy.

15.     The insurance policy was in full force in effect at all relevant times to this action.

16.     On or around October 5, 2012, while Plaintiffs were on vacation in California, a fire occurred at the Property, causing severe structural damage to nearly all of the Property's apartments and common areas.

17.     Plaintiffs dutifully and timely reported the loss to Goodville.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

18.     On or around October 15, 2012, distraught and confused under the circumstances, Plaintiffs met with Mr. Hester as well as a construction company, MPC Construction, LLC ("MPC"), to discuss how to reasonably protect the Property until repairs or a rebuild could be undertaken.

19.     MPC proposed an industry-approved method of protecting the Property, which included covering the entire roof, all broken windows, and putting up a high wire fence to secure the Property.   Other measures were also necessary, such as running dozens of industrial strength dehumidifiers all day, every day, via generators to prevent further damage.  Upon information and belief, it would have cost thousands of dollars per day, in addition to a substantial up-front cost, in order to protect the Property as MPC proposed.

20.     Mr. Hester advised Plaintiffs that MPC's proposal would be "very expensive," that Defendants were "*not going to pay for it*," and that it would not matter anyway given the extent of the damage even though the policy did provide for such coverage.

21.     Having rejected MPC's proposal, Mr. Hester instructed MPC to simply "board-up" the first floor apartment broken door and windows, reasoning that "it can't get any worse."

22.     In other words, given the extent of the damage and the substantial long-term cost for Defendants to pay for preservation of the Property, Mr. Hester believed that it made no economic sense for Defendants to pay for additional protective measures with policy limits of only $818,000.00 (*i.e.* it would be better for Defendants to simply tender policy limits).   Mr. Hester certainly believed that the protective measures he selected

4

were reasonable under the circumstances, and Plaintiffs relied on Mr. Hester's representations, experience, and expertise regarding such matters.

23.     Soon thereafter, on October 22, 2012, Plaintiffs retained a public adjuster, Bryan Finnicum of General Insurance Adjusting LLC.  Mr. Finnicum attempted to work with Mr. Hester to process Plaintiffs' claim, but such efforts were futile.  In November 2012, Mr. Finnicum sent Defendants a 108-page detailed building estimate reflecting repair and/or rebuild costs.  The estimate arrived at an approximate value of $700,000.00. Mr. Finnicum told Plaintiffs that, from the beginning, he was consistently stonewalled by Defendants regarding Plaintiffs' claim, causing unwarranted delay in processing Plaintiffs' claim through their chosen adjuster.

24.     Upon information and belief, from late Fall 2012 through Spring 2013, while the claim was supposedly being "processed", Mr. Hester and/or other of Defendants' representatives visited the Property and noticed that the Property was deteriorating due to the failure of the ineffective protective measures Defendants selected for the Property and Defendants' delay in processing Plaintiffs' straightforward claim. Specifically, the Property was suffering water/mold damage and was otherwise adversely affected by being left unguarded from the elements and trespassers.  Moreover, on numerous occasions during the same time period, Plaintiffs informed Defendants that the condition of the Property was deteriorating.  Yet Defendants did nothing in terms of either rectifying the inadequate protective measures Defendants selected and deemed reasonable or indicating to Plaintiffs that it would appropriately pay for additional protective measures under the policy during its delay in processing Plaintiffs' claim.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

25.     Plaintiffs became increasingly concerned regarding the delay in processing what should have been a relatively straightforward fire loss claim.  They contacted their public adjuster, Mr. Finnicum, on several occasions to discuss their concerns.    Mr. Finnicum had no answers because Defendants, and particularly Mr. Hester, were totally unresponsive to his analysis or cries for attention to Plaintiffs' claim.

26.     By February 27, 2013, Mr. Finnicum was fed-up with Defendants, and wrote Defendants an email, attached as Exhibit B, which Plaintiffs incorporate by reference.    Mr. Finnicum said the following in his professional opinion regarding Defendants' actions:

(1)     Defendants took an unreasonable position regarding policy language relating to the calculation of the value of Plaintiffs' claim that was a clear to attempt to limit Plaintiffs' recovery;

(2)     Defendants engaged in a "deceptive misrepresentation of coverage" through "restrictive policy interpretations . . . .";

(3)     Defendants, without any basis under the policy or otherwise, rejected his November 2012 detailed and reasonable estimate without any consideration.

(4)     Defendants refused his requests to meet with him on November 19 and December 27, 2012 and January 10 and February 27, 2013 regarding his analysis.

(5)     Defendants "demonstrated a failure to evaluate the claim objectively and unreasonably disputed the value of the loss."

(6)     Defendants "made abusive comments and unfounded accusations regarding [Plaintiffs]" in accusing them of being responsible for the fire.    These unfounded accusations included accusing Plaintiffs, who are well-respected doctors in the Cincinnati area, of running and/or housing a "meth lab" that caught on fire.    Yet there was absolutely *no* factual basis for this allegation.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

(7)     Defendants, without any factual basis, accused Plaintiffs of fraud.

(8)     Defendants, without any factual basis, called Plaintiffs "liars."

(9)     Defendants suggested to him that he should not trust Plaintiffs.

(10)    Defendants "mishand[led] [Plaintiffs'] claim."

(11)    Defendants "continually demonstrated a clear case of bad faith in claims handling."

27.     Dissatisfied with Mr. Finnicum's well-reasoned observations and estimate, on May 22, 2013, Glen Hess, one of Goodville's representatives, *finally* initiated *some* action. He coordinated a third-party appraisal to arrive at a value for the fire damage component of the claim. Upon information and belief, and as demonstrated by Mr. Finnicum's email, Defendants had never previously taken any reasonable action to evaluate or process Plaintiffs' claim.

28.     On July 1, 2013, after a delay of nearly *nine* months, an appraisal finally occurred relating to fire damage. The appraisal resulted in a July 15, 2013 reported estimate of damages of $402,317.73 relating to *fire damage only*.

29.     The scope of the appraisal report was solely to evaluate fire damage. It did not take into account approximately $224,202.00 in damage for mold remediation caused by Defendants' unreasonable delay in processing Plaintiffs' claim combined with the wholesale inadequacy of Defendants' proposed "reasonable" protective measures. Despite Defendants' assurances to Plaintiffs that things could "not get any worse", that additional protective measures would not affect Plaintiffs' claim, and Defendants' outright refusal to pay for any additional protective measures, the failure to cover the roof

7

and second and third floor windows had allowed water to permeate the Property while it was awaiting repairs or a rebuild during the unnecessary length of time it had taken for Defendants to even begin to process Plaintiffs' claim.

30.     Defendants misled Plaintiffs while intentionally misconstruing the scope and purpose of the appraisal to avoid paying what Defendants owed to Plaintiffs. Specifically, Defendants began insisting that the value arrived upon was final and binding regarding the value of the *entire* claim even though the scope of the appraisal related to fire damage only and left open the possibility for Plaintiffs to recover other losses under the policy. Moreover, Defendants never even informed Plaintiffs of Defendants' intent to invoke the appraisal for purposes of arriving at a binding value for the *entire* claim. (*See* Other Conditions, Section 1). Indeed, that was not within the scope of the appraisal or the appraisal report. Nor was it consistent Plaintiffs' understanding regarding the purpose of the appraisal, which they were led to believe was merely another estimate of claim value *limited to fire damage only* to arrive at a starting point for negotiations regarding the entire claim.

31.     Critically, the appraisal award also did not take into account loss of business income from rent, which was obviously covered under the insurance policy under its clear terms.

32.     The appraisal award also failed to pay Plaintiffs amounts owed to them under the policy to bring the Property up to "code."

33.     The third-party appraisers expressed their surprise and dismay to Plaintiffs that Defendants refused to cover mold remediation under these circumstances but adhered to the scope of their work in detailing damage solely attributable to the fire.

ELECTRONICALLY FILED 11/06/2014 14:00   /   IFIJ   /   A 1406566   /   CONFIRMATION NUMBER 372036

34.     On August 7, 2013, Plaintiffs emailed Mr. Hester to explain their concerns regarding the substantial expense of curing the mold damage and also to raise the issue of their $62,590.00 in lost business income from the fire, which was covered under the policy.  Obviously, $62,590.00 was merely the starting point for loss of income because, assuming the claim was resolved, it would take time for a construction company to make extensive repairs and/or rebuild the Property.  Plaintiffs subsequently sent Defendants documents and information substantiating their loss of business income to date.

35.     On August 13, 2013, Mr. Hester sent Plaintiffs a letter indicating that they were unwilling to further negotiate their claim, standing by an appraisal that was limited to *fire damage* only.  Mr. Hester blamed the mold and other damage on Plaintiff even though Mr. Hester selected the inadequate protective measures, refused to pay for additional measures that were covered under the policy to inappropriately minimize Defendants' liability, and inexplicably delayed in processing Plaintiffs' claim for months, resulting in the mold damage.  Mr. Hester also failed to *even begin* to process or consider Plaintiffs' business loss claim, falsely claiming, in essence, that Plaintiffs had previously refuted a claim for loss of business income.

36.     On August 22, 2013, given that the amount to resolve the claim did not take into account damage caused by Defendants' own neglect and delay or business loss that was covered under policy such that Plaintiffs would be even close to a position to restore or rebuild the Property, Plaintiffs demanded a rebuild and forwarded an estimate indicating the rebuild cost would be at least $1,020,000.00 to Mr. Hester.  Defendants did not timely respond.

9

37. On August 25, 2013, Plaintiffs followed-up with Defendants with an email explaining Plaintiffs' documentation regarding her loss of business loss income and explaining their concern that business losses were continuing to mount while Defendants dragged their feet in achieving a reasonable resolution to Plaintiffs' claim. Defendants, yet again, took no action with respect to Plaintiffs' business losses despite its awareness that these losses were covered under the policy, despite the fact that Plaintiffs had provided documentation and information supporting the loss to Defendants, and despite the fact that their own unreasonable delay and stonewalling of Plaintiffs was the cause of those losses to date.

38. Beginning in August 2013, given the deterioration of the Property caused by the fire, Defendants' "reasonable" protective measures resulting in hundreds of thousands of dollars in mold damage, and Defendants' inexplicable now 10-month delay in failing to reasonably process Plaintiffs' claim, Plaintiffs started receiving notices from the Lockland Authority that, if the Property was not promptly restored or rebuilt, the Property would be condemned and demolished. The Lockland authority was concerned that the Property was unsafe, particularly given its proximity to a nearby playground.

39. Plaintiffs repeatedly relayed this information to Defendants, seeking guidance about what to do while trying to resolve the claim in a way that would avoid demolition through either an appropriate offer for repairs or a rebuild. Defendants repeatedly did not timely respond, and instead insisted that Plaintiffs either accept an award that did not take into account amounts to which they were entitled or deal with necessary repairs or a rebuild out of their own pockets. Plaintiffs were thus, between a rock and a hard place. They obviously did not want the Property to be condemned, but

they also did not believe that Defendants' offer was even close to fair under the circumstances. Further complicating matters was that Plaintiffs did not have hundreds of thousands of dollars to pay for adequate repairs out of their own pockets to avoid demolition and pursue claims against Defendants at a later date. Upon information and belief, Defendants knew that Plaintiffs were in this vulnerable position.

40.     On September 6, 2013, Plaintiffs sent Mr. Hester an email indicating the urgency of the situation to resolve the matter in a way that would prevent it from being torn down by the Lockland Authority. In fact, Plaintiffs frequently offered to settle for less than they were entitled to under the circumstances in an effort to save the Property. Defendants failed to timely respond.

41.     On September 12, 2013, Plaintiffs reiterated the urgency of the situation, memorializing a conversation between Dr. Cindy Lee and Mr. Hess in an email. Mr. Hess indicated that he would have to speak to his manager about the situation.

42.     In an email dated September 13, 2013, Mr. Hess indicated that Defendants were unwilling to entertain anything but the awarded amount of $402,317.73 relating to fire damage only.

43.     After more back and forth, on September 26, 2013, Goodville's representative, Mr. Zimmerman, via email, appeared to change his mind and agree to pay policy limits towards a rebuild of the Property. Mr. Zimmerman indicated that Plaintiffs needed to sign the appropriate paperwork at Goodville's attorneys' office.

44.     Somewhat relieved, Plaintiffs immediately attempted to contact Goodville's attorney, Matthew Stubbs, via telephone but were unable to reach him.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

45.     On September 30, 2013, Plaintiffs emailed Mr. Zimmerman and indicated that she was unable to get in touch with Mr. Stubbs. She asked Mr. Zimmerman if he had contacted the attorney regarding the paperwork. Upon information and belief, Mr. Zimmerman had not, and Mr. Stubbs never had the paperwork.

46.     On October 1, 2013, Mr. Zimmerman sent Plaintiffs a letter indicating that Mr. Hess would contact Mr. Stubbs regarding the paperwork.

47.     On October 4, 2013, Plaintiffs emailed Mr. Stubbs directly raising serious concerns about the status of the Property and indicating a desire to promptly begin the rebuild process.

48.     Apparently, on October 9, 2013, Defendants once again changed their tune regarding paying for a rebuild. During a phone call from that same day, Defendants indicated they were now unwilling to pay for a rebuild and again reverted to their position that the low-ball appraisal award was the only amount Defendants would pay. Plaintiffs indicated to Defendants that, absent an agreement to settle for the amount that would allow them to restore and/or rebuild the Property, they would have no choice but to allow the Property to be demolished.

49.     On that same day, Plaintiffs pleaded with the Lockland Authority to delay demolition to make one last plea to Defendants to agree to pay for the necessary construction and/or repairs.

50.     Plaintiffs' final plea to Defendants fell on deaf ears. Ultimately, with Plaintiffs handcuffed by Defendants' actions, the Lockland Authority condemned and demolished the Property at a cost of $88,443.00 in October 2013. Defendants disclaimed

ELECTRONICALLY FILED 11/06/2014 14:00   /   IFIJ   /   A 1406566   /   CONFIRMATION NUMBER 372036

any liability for the demolition costs despite the fact that their own actions described above caused the demolition.

51.    On November 19, 2013, Defendants staggeringly emailed Plaintiffs post-demolition to alert Plaintiffs that their *claim had still not been fully processed*, and that Defendants investigation was *still ongoing*.  In other words, after multiple unreasonable delays, after multiple misconstructions of the insurance policy language, after multiple false representations to Plaintiffs, and after blatant failures to timely or reasonably process aspects of Plaintiffs' loss for which Plaintiffs were entitled to recover, Defendants' investigation and claims processing were *still* ongoing more than 13 months after the date of loss.

52.    Upon information Defendants never made any good faith final determination regarding whether to pay out on Plaintiffs' claim.

53.    To date, Plaintiffs have received no compensation from Defendants regarding Plaintiffs' claim.

54.    Upon information and belief, Defendants consciously failed to follow their own policies, practices and/or guidelines regarding Plaintiffs' claims as well as the standard of care regarding claims handling and/or processing in the insurance industry.

### COUNT I: BAD FAITH AS TO ALL DEFENDANTS

55.    Plaintiffs incorporate the allegations in Paragraphs 1-54.

56.    Defendants, as insurers and insurance representatives, owed Plaintiffs a duty to act in good faith in dealing with Plaintiffs when handling, processing, and/or evaluating Plaintiffs' claim.

13

57. Defendants breached this duty by failing to conduct a reasonable investigation into Plaintiffs' claim, exploiting Plaintiffs' vulnerable position for its own benefit, delaying in processing Plaintiffs' claim, making "low-ball" offers to Plaintiffs that lacked any reasonable justification, and/or intentionally misinterpreting the insurance contract to avoid coverage and cause delay. More specifically:

    a.    Defendants refused to cover MPC's "very expensive" proposed measures to protect Plaintiffs' structure, even though such measures were covered under the policy in an effort to unreasonably minimize Defendants' liability for the loss.

    b.    Defendants ordered MPC to "board-up" only the first floor windows and doors because, according to Defendants, such measures were reasonable under the circumstances and would not make a difference regarding Plaintiffs' claim given the severity of the damage to the Property even though Defendants did so simply to unreasonably minimize their liability for the loss.

    c.    Defendants stonewalled Plaintiffs' public adjuster for approximately 5 months while disregarding his detailed loss analysis without justification, causing an initial unwarranted delay in processing Plaintiffs' claim in an effort to delay payment and/or minimize Defendants' payment on Plaintiffs' loss.

    d.    From the outset of the claims handling process, Defendants made unreasonable interpretations of clear insurance policy provisions in order to limit Plaintiffs' recovery and mislead Plaintiffs regarding available coverage. This resulted in an additional unjustified delay in processing Plaintiffs' claim.

    e.    Defendants made unfounded and bad faith accusations against Plaintiffs, who are well-respected doctors, accusing them of being responsible for starting a fire via a purported meth lab while calling Plaintiffs' liars and/or accusing them of fraud. Defendants, in essence, engaged in an unfounded and defamatory witch hunt to either delay payment or concoct a story to avoid payment altogether without conducting any reasonable investigation. In fact, the "investigation" was a sham and nothing more than a stall

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

tactic designed to create delay and intimidate Plaintiffs to settle for minimal value while Plaintiffs were in a vulnerable position.

f.     Defendants attempted to use an appraisal that, by its very terms and nature, related to fire damage only to bar Plaintiffs' pursuit of losses relating to Defendants' own failures and delays as well as business losses to which Plaintiffs were entitled under the policy. Defendants also made false representations to Plaintiffs that they had somehow disclaimed rights to their loss of business income. At the same time, Defendants misled Plaintiffs regarding the purportedly "binding" nature of the appraisal.

g.     After an unjustified delay of over 10 months in processing Plaintiffs' claim, Defendants blamed Plaintiffs' purported failure to reasonably protect the Property for extensive mold damage even though Defendants represented to Plaintiffs that they would not pay for MPC's proposed measures that were covered under the policy, selected the proposed measures themselves, represented to Plaintiffs that the measures were reasonable under the circumstances, and were aware of the deteriorating condition of the Property as a result of those measures. Defendants' refusal to pay for additional protective measures was an effort to unjustifiably minimize payment for Plaintiffs' loss.

h.     After Plaintiffs provided Defendants with evidence of business losses, Defendants took absolutely no action to investigate and/or process that aspect of the claim even though business losses were covered under the policy.

i.     Defendants pulled a "bait-and-switch" on Plaintiffs by initially refusing to pay policy limits towards a rebuild of the Property, then agreeing to pay policy limits towards a rebuild, and then once again denying policy limits for a rebuild while at the same time failing to be responsive to Plaintiffs' obvious concerns that the Property would be demolished due to Defendants' actions.

j.     Defendants indicated that as of November 2013, more than *a year* after the fire, that the claim was *still* inexplicably under investigation and in processing, and that a final decision regarding whether to honor the claim had *still* not been made.

15

k.   Defendants created an unnecessary delay in processing a claim, and then blamed that delay on Plaintiffs without justification in order to coerce Plaintiffs to accept less than the amount to which they were entitled under the policy.

l.   Defendants refused to pay for demolition costs for the Property even though their own actions regarding Plaintiffs' claim caused the Property to be demolished.

m.   Defendants took advantage of Plaintiffs' compromised emotional state given the fire as well as her reliance on Defendants in accepting Defendants' proposed protective measures and various improper policy interpretations.

n.   Defendants took advantage of Plaintiffs by forcing them to choose between accepting an offer that did not accurately reflect the amount they were entitled to or having the Property demolished knowing that it was unlikely that Plaintiffs had the ability to fund the total necessary repairs or a rebuild out of their own pockets.

o.   Upon information and belief, Defendants consciously failed to follow their own policies, practices and guidelines regarding Plaintiffs' claims as well as the standard of care claims handling and/or processing in the insurance industry.

58.   As a direct and proximate result of Defendants' bad faith, Plaintiffs suffered economic and non-economic damages, including emotional distress and pain and suffering, in excess of $250,000.00 to be proven at trial.

## COUNT II: BREACH OF CONTRACT/INSURANCE POLICY AS TO GOODVILLE

59.   Plaintiffs incorporate the allegations in Paragraphs 1-58.

60.   The insurance policy constituted a contract between Plaintiffs and Goodville.

61.   Plaintiffs performed their obligations under the insurance policy.

16

62.    As set forth above, Goodville breached the insurance policy by failing to pay Plaintiffs the amounts owed to her under the policy.

63.    As a direct and proximate result of Goodville's breaches, Plaintiffs suffered damages in excess of $250,000.00 to be proven at trial.

## COUNT III: NEGLIGENT MISREPRESENTATION AS TO ALL DEFENDANTS

64.    Plaintiffs incorporate the allegations in Paragraphs 1-63.

65.    As an insurer and/or insurance representative, a confidential and/or special relationship existed between Plaintiffs and Defendants that gave rise to a duty for Defendants to provide accurate information to Plaintiffs.

66.    For at least the reasons stated in Paragraph 57 above, Defendants breached that duty by, *inter alia*: (1) representing the protective measures they selected were reasonable and would not matter for purposes of processing Plaintiffs' claim; and/or (2) representing that they would pay for a rebuild when they had no intention of doing so.

67.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs suffered economic and non-economic damages, including emotional distress and pain and suffering, in excess of $250,000.00 to be proven at trial.

## COUNT IV: FRAUD AS TO ALL DEFENDANTS

68.    Plaintiffs incorporate the allegations in Paragraphs 1-67.

69.    Throughout the parties' relationship regarding the claim, Defendants engaged in a fraudulent course of conduct in order to attempt to minimize their payment on Plaintiffs' claim.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

70.     The relationship between Plaintiffs and Defendants was such that Defendants owed Plaintiffs a duty to speak up and/or clarify false information provided to Plaintiffs.

71.     Defendants engaged in at least the following fraudulent conduct:

a.      Defendants represented to Plaintiffs that Defendants would not pay for protective measures under the policy even though Defendants knew the policy provided for such coverage.

b.      Defendants represented to Plaintiffs that the protective measures Defendants selected were sufficient and reasonable even though Defendants knew they were not.

c.      Defendants represented to Plaintiffs and Plaintiffs' adjuster that the policy excluded certain items of loss or calculated loss a certain way when they knew that was false. (*See* Ex. B).

d.      Defendants attempted to use an appraisal relating to fire damage only to evaluate the entire claim when they knew that was improper.

e.      Defendants represented that they would pay for a rebuild of the Property when Defendant had no intention to do so.

f.      Defendant failed to "speak up" and inform Plaintiffs that Defendants were responsible for paying for protective measures.

g.      Defendants failed to "speak up" and inform Plaintiffs that, contrary to their representations to Plaintiffs, they did not consider the protective measures reasonable such that it would affect the amount Defendants paid on Plaintiffs' claim.

h.      Defendants failed to "speak up" and inform Plaintiffs that the protective measures Defendants selected were inappropriate.

18

72. Upon information and believe, Defendants knew their representations were false at the time they were made and/or knew that their failure to speak up and/or clarify false information that they provided to Plaintiffs would result in harm to Plaintiffs.

73. Plaintiffs reasonably relied on Defendants' misrepresentations and/or failure to speak up or clarify information in failing to take additional protective measures regarding the Property and not taking additional action regarding Defendants' unreasonable delay in processing Plaintiffs' claim.

74. As a direct and proximate result of Defendants' fraud, Plaintiffs suffered economic and non-economic damages, including emotional distress and pain and suffering, in excess of $250,000.00 to be proven at trial.

## COUNT V: PROMISSORY AND/OR EQUITABLE ESTOPPEL AS TO ALL DEFENDANTS

75. Plaintiffs incorporate the allegations in Paragraphs 1-74.

76. Defendants represented to Plaintiffs that the protective measures they undertook with the Property were sufficient under the circumstances and would not affect coverage.

77. Defendants represented to Plaintiffs that the third-party appraisal would relate to fire damage only.

78. Plaintiffs reasonably relied on these representations in not taking additional protective measures regarding the Property and by following-through with the third party appraisal.

79. As a direct and proximate result of Plaintiffs' reliance on Defendant's representations, Plaintiffs suffered damages in excess of $25,000.00 to be proven at trial.

19

## COUNT VI: PUNITIVE DAMAGES

80.     Plaintiffs incorporate Paragraphs 1-79.

81.     Defendants' actions or omissions demonstrate malice, aggravated or egregious fraud, oppression, or insult, and/or that Defendants' principals and/or masters authorized, participated in, or ratified actions or omissions of Defendants' agents and/or servants.

82.     Defendants' actions evidence a conscious disregard for the rights and safety of Plaintiffs and others.

83.     Plaintiffs are entitled to punitive damages as a measure to punish Defendants for their wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that they be awarded an amount in excess of $1,000,000.00 for their economic and non-economic damages.   In addition, Plaintiff requests that she be awarded: (1) prejudgment and/or postjudgment interest; (2) attorneys' fees and costs incurred in this action; (3) punitive damages; and (4) all other relief that the Court deems appropriate.


Respectfully submitted,


Avonte D. Campinha-Bacote (0085845)
Joseph B. Russell (0084098)
Campinha Bacote LLC
Two Miranova Place, Suite 500
Columbus, Ohio 43215
Telephone: (614) 233-4727

ELECTRONICALLY FILED 11/06/2014 14:00   /   IFIJ   /   A 1406566   /   CONFIRMATION NUMBER 372036

Facsimile: (415) 276-2988
Avonte@cambaclaw.com
Joe.Russell@cambaclaw.com

Trial Attorneys for Plaintiffs

**JURY DEMAND**

Plaintiffs demand a jury trial as to all issues triable to a jury.

Avonte D. Campinha-Bacote

**PRAECIPE**

Plaintiff requests that the Clerk of Courts serve the following parties via certified

mail:

Goodville Mutual Casual Co.
625 West Main St., P.O. Box 489
New Holland, PA 17557-0489

Claim-Net, LLC,
4190 N. State Road 39
Lebanon, Indiana 46052

Dennis Hester,
4190 N. State Road 39
Lebanon, Indiana 46052

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

EXHIBIT A

COPY



| Goodville Mutual Casualty Company<br>625 West Main Street, PO Box 489<br>New Holland, PA 17557-0489<br>www.goodville.com | Business<br>Cover Plus<br>Policy | New Declarations<br>Policy Prefix BC<br>Policy No. 923823<br>Mailbox: 3432 79 |
|---|---|---|

| Named Insured<br>and<br>Mailing Address | Cindy Lee<br>Ct Lee<br>9120 Hoffman Farm Ln<br>Cincinnati OH 45242-7314 |
|---|---|
| Agency name<br>and Address | Hornafius Insurance Agency, Inc.<br>23 S Market St<br>Elizabethtown PA 17022-2308<br>(717) 367-5126 |

Type of Entity: Individual

**Policy Period:** 12:01 A.M. Standard Time at the described location from    12/12/11 to 12/12/12

**Business Description:** Apartments/Rental Dwellings

In return for the payment of premium, and subject to all terms of this policy, we agree with you to provide the insurance as stated in this policy. This premium may be subject to adjustments. Audit premiums are due within thirty days of the audit billing date. This Declarations together with the Common Policy Conditions Coverage Part Declarations, Coverage Part Coverage Form(s) and Endorsements, if any, issued to form a part thereof, completes the above numbered policy.

## Commercial General Liability Coverage

| | Limits of Insurance | |
|---|---|---|
| General Aggregate $ | 2,000,000 | |
| Products/Completed Work Aggregate $ | 2,000,000 | |
| Personal/Advertising Injury $ | 1,000,000 | |
| Each Occurrence $ | 1,000,000 | |
| Fire Legal Liability $ | 100,000 | per occurrence |
| Medical Payments $ | 5,000 | per person |

Location No. 1: 500 Williams St, Cincinnati, Hamilton Co OH 45215
   Building 1:   12 Unit Rental Dwelling

Total Liability Premium $    257

## Commercial Property Coverage

Location No. 1: 500 Williams St, Cincinnati, Hamilton Co OH 45215
   1.00 miles to fire department: Cincinnati

| | | Limit of<br>Insurance | Deductible | Valuation | Use/Occupancy |
|---|---|---|---|---|---|
| Building No. 1 | | $ 818,000 | $ 1,000 | RCV | 12 Unit Rental Dwelling |

## Miscellaneous Property Coverages

| | Increased Amount |
|---|---|
| Ordinance/Law | |

Total Property Premium $ 1,661

Other Endorsement Premium $    48
**Total Policy Premium $ 1,966**

## Form(s) and Endorsements

Form(s) and Endorsements made part of this policy at the time of issue:

| | | | | |
|---|---|---|---|---|
| BCP(0511) | CGLYCR(0798) | CL0126(0101) | CL0600(0108) | CL0605(0108) |
| CL0700(1006) | CL100(1.0) | CL300(1.0) | CPYCR(0798) | CP0171(1008) |
| CP0635(0807) | CP0640(0703) | CP0643(0108) | CP100(1.0) | CP12(1.0) |
| CP138(1.0) | CP85(1.0) | CR0100(0699) | GL0163(0108) | GL0209(1005) |
| GL0215(1005) | GL0250(0108) | GL0348(0602) | GL0894(1210) | GL0936(0111) |
| GL0950(1299) | GL1022(0909) | GMWIS(0610) | IM0185(0807) | IM1000(0105) |
| SAE(0898) | | | | |

**Notices:**

| | |
|---|---|
| CL1045B(1208) | WRCPPN(0804) |

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

1/04/13         P         Insured         BC 923823 &1FR



**Goodville Mutual Casualty Co...,any**
625 West Main Street, PO Box 489
New Holland, PA 17557-0489
www.goodville.com

# *Notice*

CL1045B 12 08

### POLICYHOLDER DISCLOSURE
### NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act. See the next page for a further description of an act of terrorism as provided under the Act.

The law requires that we offer this coverage to you at each renewal. **Even if you previously rejected this coverage, you will need to sign the statement below and return it to us, along with your payment.**

If you have any questions about this coverage, please contact your agent.

### ACCEPTANCE OR REJECTION OF TERRORISM INSURANCE COVERAGE

You may accept or reject this offer of coverage. If you choose to accept this coverage, the premium for this coverage is payable according to the terms of your billing notice. You may reject this offer by completing and signing the statement below and returning it to us. If you send us a signed rejection of coverage, your policy will exclude coverage for certified terrorism losses.

The portion of your annual premium that is attributable to coverage for acts of terrorism, as defined in the Act, is:
$      48  .

_____ I accept this offer of terrorism coverage and acknowledge that I have been notified that under the Terrorism Risk Insurance Act as amended, any covered losses resulting from certified acts of terrorism under my policy will be partially reimbursed by the United States and I have been notified of the amount of my premium attributable to such coverage.

_____ I hereby reject this offer of coverage. I understand that an exclusion of certified terrorism losses will be made part of this policy.

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States under a fomula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States government generally pays 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium shown above does not include any charges for the portion of loss covered by the federal government under the Act.

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Policyholder's Signature: _____  Date: _____

Print Name _____

CL1045B 12 08                        Page 1 of 2

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1408868 / CONFIRMATION NUMBER 372036     BC 923823 &1FR

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002, "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States ---- (i) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or outside the United States in the case of (I) an air carrier or vessel described in paragraph (5)(B); or (II) the premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United states or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states, "No act shall be certified by the Secretary as an act of terrorism if (I) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(1)(C)and (D) specify that the determinations are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.



**Goodville Mutual Casualty Company**
625 West Main Street, PO Box 489
New Holland, PA 17557-0489
www.goodville.com

# *Endorsement*

**BCP 05 11**

## BUSINESS COVER PLUS AMENDATORY ENDORSEMENT

For no additional premium, this policy provides the following extensions of property and liability coverages.

### PROPERTY EXTENSIONS

A. **Accounts Receivable** - The first sentence of the Accounts Receivable Coverage Agreement is deleted and replaced by the following:

"We" provide up to $10,000 coverage as described in the Accounts Receivable Coverage form, subject to all the "terms" of this coverage.

B. **Antennas, Awnings, Canopies, Fences and Signs** - Under the Supplemental Coverages, the coverage extension limit of $1000 will be applied to each class of outdoor property. The coverage extension limit for signs is deleted if "we" insure "your" building.

C. **Coinsurance Waiver** - In the General Conditions Part, the coinsurance provision applicable to this policy is waived.

D. **Fire Company Donation** - If the fire company does not bill "you" for their services and at "your" request, "we" will donate $250 to the fire department in "your" fire district or town that assists in extinguishing a covered loss.

E. **Fire Extinguisher Recharge** - "We" will pay up to $2000 to recharge "your" portable fire extinguishers after they have been used to fight a fire on the insured premises. The deductible will not be applied to this extension of coverage.

F. **Glass Breakage** - In the Special Perils Part, the Glass Breakage limitation is deleted if "we" insure "your" building.

G. **Income Coverage Part**

#### Additional Definitions

1. **Business** means normal business activities occurring at the described premises including the tenant-ability of the described premises when the selected coverage option includes "rents".

2. **Restoration period** means the time it should reasonably take to resume "your business" starting from the date of loss to the described premises caused by a covered peril, and ending on the date the property should be rebuilt, repaired, or replaced. "We" will pay loss of earnings, rents and extra expense incurred within 12 months after the loss or damage to property. This is not limited by the expiration date of the policy.

This does not include any increase in time due to the enforcement of any ordinance, law, or decree that regulates or requires:

    a. the construction, use, repair, or demolition of any property; or
    b. the testing, evaluating, observing, or recording the existence, level, or effects of pollutants.

3. **Rents** means "your" actual loss of:

    a. rental income of the described premises as furnished or equipped less any expenses that do not continue;
    b. the rental value of any part of the described premises that "you" occupy less any expenses that do not continue; and
    c. other charges for which a tenant is legally obligated and for which "you" would otherwise be obligated.

#### Coverage Options
1. Earnings, "rents", and extra expense.

"We" provide coverage during the "restoration period" when "your business" is necessarily interrupted by direct physical loss to real or personal property as a result of a covered peril. This coverage applies only when the loss to real or personal property is at the described premises or in the open (or in vehicles) within 100 feet thereof.

#### Earnings
"We" cover "your" actual loss of net income (net profit or loss before income taxes), payroll expense, interest and other continuing operating expenses normally incurred and earned by "your business".

"We" cover only the expenses that are necessary during the "restoration period". Consideration is given to continuation of payroll and other expenses to the extent necessary to resume "your business" with the same quality of service that existed before the loss.

#### Extra Expense
"We" cover the necessary extra expenses that "you" incur to resume or continue "your business" as nearly as practicable.

"We" cover only the extra expenses that are necessary during the "restoration period".

BCP 05 11          **Based on copyrighted material of AAIS**          Page 1 of 17

BC 923823  &1FR

BCP 05 11

"We" cover extra expenses to repair, replace, or restore any property, but only to the extent that they reduce the loss otherwise payable under this Coverage Part.

"We" cover extra expenses to research, replace, or restore information on damaged valuable papers and records, but only to the extent that they reduce the loss otherwise payable under this Coverage Part.

### Exclusions and Limitations

1. **Electronic Information** – "We" do not cover loss of earnings caused by damage to or loss of electronic information beyond:

   a. 60 consecutive days from the date of loss; or
   b. the time from the date of loss until the date "you" could reasonably rebuild, repair, or replace other damaged property at the described premises caused by the same occurrence

   whichever is greater.

   Electronic information is media, programs, or records for electronic data processing or electronically controlled equipment including films, tapes, discs, drums, or cells.

2. **Finished Stock** – "We" do not cover loss of earnings caused by loss to stock manufactured by "you" which is ready to pack, ship, or sell. This does not apply to stock manufactured for retail outlets that "you" own.

3. **Fire Extinguishment** – "We" do not cover expenses to put out a fire.

4. **Leases, Licenses, Contracts, or Orders** – "We" do not cover any increase in loss due to the suspension, lapse, or cancellation of leases, licenses, contracts, or orders.

   However, "we" do cover loss during the "restoration period" if the suspension, lapse, or cancellation results directly from the interruption of "your business".

   "We" do not cover any extra expense caused by the suspension, lapse, or cancellation of leases, licenses, contracts, or orders beyond the "restoration period".

5. **Strikes, Protests, and Other Interference** – "We" do not cover any increase in loss due to interference by strikers or other persons at the described premises. This applies to interference with rebuilding, repairing, or replacing the property or with resuming "your business".

6. **Unnecessary Expenses** – "We" do not cover any expenses that are not necessary during the "restoration period".

### Additional Coverages

1. **Alterations and New Buildings** – "We" extend "your" coverage for earnings and extra expense to include loss caused by damage to:

   a. additions or alterations;
   b. new buildings or structures, completed or under construction; and
   c. machinery, equipment, supplies, or building materials located on or within 100 feet of the described premises used in the construction, alterations, or additions; or incidental to the occupancy of new buildings or structures

   at the described premises caused by a covered peril.

   If such loss delays the start of "your business", the "restoration period" starts from the time "your business" would have begun had no loss occurred. This does not increase the limit.

2. **Interruption by Civil Authority** – "We" extend "your" coverage for earnings and extra expense to include loss while access to the described premises is specifically denied by an order of civil authority. This order must be a result of damage to property other than at the described premises and caused by a covered peril. This extension is limited to two consecutive weeks from the date of the order. This does not increase the limit.

3. **Newly Acquired Locations** – "We" extend "your" coverage for earnings and extra expense to include loss caused by damage to property at locations, other than at fairs or exhibitions, that "you" acquire. The damage must be caused by a covered peril. The most "we" pay is 10 percent of the highest limit shown on the "declarations" for this Coverage Part, but not exceeding $100,000.

   This coverage applies for 30 days after "you" acquire the location or until "you" report the newly acquired location to "us", whichever occurs first. This coverage does not go beyond the expiration of this policy.

   "You" must pay any additional premium due from the date "you" acquire the location.

   This is an additional amount of insurance and is not subject to and not considered in applying coinsurance.

4. **Period of Loss Extension** – "We" extend "your" coverage for earnings to cover loss from the date the property that incurred the loss is rebuilt, repaired, or replaced until:

   a. the end of 30 consecutive days (unless otherwise shown on the "declarations"); or

ELECTRONICALLY FILED 11/06/2014 14:00   /   IFIJ   /   A 1406566   /   CONFIRMATION NUMBER 372036

BC 923823 &1FR

BCP 05 11

b.   the date "you" could reasonably resume "your business" to the conditions that would have existed had no loss occurred,

whichever is earlier.

This does not increase the limit.

Perils Covered
See the applicable Perils Part shown on the "declarations".

H.   **Increased Costs - Ordinance or Law -** Under Supplemental Coverages the coverage extension limit is changed from $5000 to $10,000.

I.   **Inflation Guard -** The company will amend the Limits of Insurance at the beginning of each renewal policy period (or each annual period of the policy term) based upon reports of a nationally recognized appraisal agency which reflect local changes in the cost of construction. Payment of the renewal premium will constitute the insured's acceptance of the revised limits as shown on the Commercial Property Coverage Part.

During the period between the annual adjustments stated above, the Limits of Insurance shown on the Commercial Property Coverage Part shall be increased at a pro rata amount of the latest annual adjustment factor.

The latest annual adjustment factors are available from the company upon request.

J.   **Installation Coverage**

In this coverage form, the words "you" and "your" mean the persons or organizations named as the insured on the declarations and the words "we", "us", and "our" mean the company providing this coverage.

Refer to the Definitions section at the end of this coverage form for additional words and phrases that have special meaning. These words and phrases are shown in quotation marks.

**AGREEMENT**

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Installation Floater Coverage. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

The most "we" pay under this coverage is $2,500, unless otherwise indicated.

**PROPERTY COVERED**

"We" cover only the following property and only to the extent the property is not otherwise excluded or subject to limitations.

1.   **Coverage --** "We" cover direct physical loss or damage caused by a covered peril to:

a.   "your" materials, supplies, fixtures, machinery, or equipment; and

b.   similar property of others that is in "your" care, custody, or control

while at "your" "jobsite" and that "you" are installing, constructing, or rigging as part of an "installation project".

2.   **Coverage Limitations --**

a.   "We" only cover materials, supplies, machinery, fixtures, and equipment that will become a permanent part of "your" completed "installation project".

b.   If Scheduled Locations Coverage is indicated on the "schedule of coverages", "we" only cover an "installation project" at a "jobsite" that is described on the "schedule of coverages".

3.   **We Do Not Cover --** "We" do not cover materials, supplies, fixtures, machinery, or equipment that "you" are not or will not be installing, constructing, or rigging.

4.   **We Do Not Pay --** "We" do not pay for any penalties for:

a.   noncompletion or late completion of an "installation project" in accordance with the provisions or conditions in the installation or construction contract; or

b.   noncompliance with any provisions or conditions in the installation or construction contract.

5.   **Limit --**

a.   If Blanket Coverage is indicated on the "schedule of coverages", the most "we" pay in any one occurrence for loss or damage to materials, supplies, machinery, fixtures, and equipment at any one "jobsite" is the Jobsite Limit indicated on the "schedule of coverages".

b.   If Scheduled Locations Coverage is indicated on the "schedule of coverages", the most "we" pay in any one occurrence for loss or damage to materials, supplies, machinery, fixtures, and equipment is the "limit" indicated on the "schedule of coverages" for that "jobsite".

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

## PROPERTY NOT COVERED

1. **Airborne Property** -- "We" do not cover property while airborne except while in transit on a regularly scheduled airline flight.

2. **Buildings, Structures, And Land** -- "We" do not cover buildings, structures, or land.

3. **Contraband** -- "We" do not cover contraband or property in the course of illegal transportation or trade.

4. **Machinery, Tools, Or Equipment** -- "We" do not cover machinery, tools, equipment, or similar property that will not become a permanent part of "your" "installation project".

5. **Trees, Shrubs, And Plants** -- "We" do not cover trees, shrubs, plants, or lawns.

6. **Waterborne Property** -- "We" do not cover property while waterborne except while in transit in the custody of a carrier for hire.

## COVERAGE EXTENSIONS

**Provisions That Apply To Coverage Extensions** -- The following Coverage Extensions indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension within this coverage form, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage, including a Coverage Extension, Supplemental Coverage, or other coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following coverage extensions are not subject to and not considered in applying coinsurance conditions.

1. **Debris Removal** --

   a. **Coverage** -- "We" pay the cost of debris removal. Debris removal means the costs for the demolition, clearing, and removal of debris of covered property if such debris results from a covered peril.

   b. **We Do Not Cover** -- This coverage does not include costs to:

      1) extract "pollutants" from land or water; or
      2) remove, restore, or replace polluted land or water.

   c. **Limit** -- "We" do not pay any more under this coverage than 25% of the amount "we" pay for the direct physical loss or damage exclusive of the costs for debris removal. "We" will not pay more for loss to property and debris removal combined than the "limit" for the damaged property.

   d. **Additional Limit** -- "We" pay up to an additional $5,000 for debris removal expense when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or when the loss to property and debris removal combined exceeds the "limit" for the damaged property.

   e. **You Must Report Your Expenses** -- "We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss to covered property.

2. **Emergency Removal** --

   a. **Coverage** -- "We" cover any direct physical loss or damage to covered property while it is being moved or being stored to prevent a loss caused by a covered peril.

   b. **Time Limitation** -- This coverage applies for up to ten days after the property is first moved. Also, this coverage does not extend past the date on which this policy expires.

3. **Limited Fungus Coverage** --

   a. **Coverage** -- "We" pay for:

      1) costs and expenses arising out of the presence of "fungus" on covered property caused by or resulting from a covered peril; and
      2) direct physical loss or damage to covered property caused by or relating to the existence of or any activity of "fungus".

   b. **Coverage Limitation** -- "We" only provide the coverage described in item 3.a. above:

      1) when the "fungus" is the result of:

         a) a "specified peril" other than fire or lightning; or
         b) "flood" (if Flood Coverage is provided under this policy);

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

that occurs during the policy period; and

2) only if all reasonable steps were taken to protect the property from additional damage at and after the time of the occurrence.

c. **Limited Fungus Coverage Limit --** The most "we" pay for all loss or damage covered by this Coverage Extension at all "jobsites" is $15,000, unless another "limit" is indicated on the "schedule of coverages". The Limited Fungus Coverage Limit applies regardless of the number of claims made, occurrences, or "jobsites".

The Limited Fungus Coverage Limit applies regardless of the number of "jobsites" or "installation projects" insured under this policy.

The Limited Fungus Coverage Limit is the most that "we" pay for the total of all loss or damage arising out of all occurrences of "specified perils", other than fire or lightning, or "flood" (if applicable) during each separate 12-month period beginning with the inception date of this policy.

d. **If The Policy Period Is Extended --** If the policy period is extended for an additional period of less than 12 months, this additional period will be considered part of the preceding period for the purpose of determining the Limited Fungus Coverage Limit.

e. **Recurrence And Continuation Of Fungus --** The Limited Fungus Coverage Limit is the most that "we" pay with respect to a specific occurrence of a loss that results in "fungus" even if such "fungus" recurs or continues to exist during this or any future policy period.

f. **Limited Fungus Coverage Limit Applies To Other Costs Or Expenses --** The Limited Fungus Coverage Limit also applies to any cost or expense to:

1) clean up, contain, treat, detoxify, or neutralize "fungus" on covered property or remove "fungus" from covered property;
2) remove and replace those parts of covered property necessary to gain access to "fungus"; and
3) test for the existence or level of "fungus" prior to or following the repair, replacement, restoration, or removal of damaged property if it is reasonable to believe that "fungus" is present.

g. **Loss Not Caused By Fungus --** If there is a covered loss or damage to covered property not caused by "fungus", loss payment will not be limited by the "terms" of this coverage extension. However, to the extent that "fungus" causes an increase in the loss, that increase is subject to the "terms" of this Coverage Extension.

## SUPPLEMENTAL COVERAGES

**Provisions That Apply To Supplemental Coverages --** The following Supplemental Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage within this coverage form, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

The "limit" available for coverage described under a Supplemental Coverage:

a. is the only "limit" available for the described coverage; and
b. is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension, including a Supplemental Coverage, Coverage Extension, or other coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following Supplemental Coverages are not subject to and not considered in applying coinsurance conditions.

1. **Pollutant Cleanup And Removal --**

   a. **Coverage --** "We" pay "your" expense to extract "pollutants" from land or water if the discharge, dispersal, seepage, migration, release, or escape of the "pollutants" is caused by a covered peril that occurs during the policy period.

   b. **Time Limitation --** The expenses to extract "pollutants" are paid only if they are reported to "us" in writing within 180 days from the date the covered peril occurs.

   c. **We Do Not Cover --** "We" do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants".

   However, "we" pay the cost of testing that is necessary for the extraction of "pollutants" from land or water.

Based on copyrighted material of AAIS

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

BC 923823 &1FR

BCP 05 11

d. **Limit** — The most "we" pay for each location is $10,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12-month period of this policy.

2. **Sewer Backup** --

a. **Coverage** — "We" cover direct physical loss or damage to covered property caused by or resulting from:

1) water or waterborne material that backs up, overflows or is otherwise discharged through a sewer or drain, sump or septic tank; or
2) water or waterborne material below the surface of the ground, including but not limited to water or waterborne material that exerts pressure on or flows, seeps, or leaks through or into a covered "installation project", sidewalk, driveway, foundation, swimming pool, or other structure.

b. **Coverage Limitations** — "We" do not cover loss or damage caused by or resulting from:

1) escape of water or waterborne material from a sump pit not equipped with a sump pump;
2) failure to perform routine maintenance and repair of all sump pumps and related equipment; and
3) failure to perform routine maintenance of sewers and drains including keeping sewers and drains free from obstructions. This limitation does not apply if "you" are not responsible for the maintenance of sewers or drains that results in loss or damage.

c. **Limit** -- The most "we" pay in any one occurrence under this Supplemental Coverage is $5,000.

3. **Temporary Storage Locations** --

a. **Coverage** -- "We" cover direct physical loss or damage caused by a covered peril to materials, supplies, fixtures, machinery, or equipment that will become a permanent part of a covered "installation project" while temporarily in storage at a location away from "your" "jobsite".

b. **We Do Not Cover** -- "We" do not cover property in a temporary storage location if the property has not been specifically allocated to or otherwise identified with a covered "installation project".

c. **Limit** -- The most "we" pay in any one occurrence for loss to property at a storage location is $5,000.

4. **Transit** —

a. **Coverage** -- "We" cover direct physical loss or damage caused by a covered peril to materials, supplies, machinery, fixtures, and equipment that will become a permanent part of a covered "installation project" while they are in transit.

b. **Limit** -- The most "we" pay in any one occurrence for loss to property in transit is $5,000.

## PERILS COVERED

"We" cover risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

a. **Civil Authority** -- Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

"We" do cover loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

b. **Earth Movement** — Any "earth movement".

However, if eruption, explosion, or effusion of a volcano results in "volcanic action", "we" will pay for the loss or damage caused by that "volcanic action".

If "earth movement" results in fire, "we" will pay for the loss or damage caused by that fire. If "earth movement" (other than eruption, explosion, or effusion of a volcano) results in explosion, "we" will pay for the loss or damage caused by that explosion.

This exclusion does not apply to covered property while in transit.

c. **Flood** -- "Flood".

"We" also do not cover waterborne material carried or otherwise moved by "flood", whether or not driven by wind, including storm surge, or material carried or otherwise moved by mudslide or mudflow.

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

However, if "flood" results in fire, explosion, or sprinkler leakage, "we" will pay for the loss or damage caused by that fire, explosion, or sprinkler leakage.

This exclusion does not apply to covered property while in transit.

d. **Fungus** -- Except as provided under Coverage Extensions - Limited Fungus Coverage, the existence of or any activity of "fungus".

But if "fungus" results in a "specified peril", "we" cover loss or damage caused by that "specified peril".

This exclusion does not apply to:

1) loss that results from fire or lightning; or
2) collapse caused by hidden decay.

e. **Nuclear Hazard –** Nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

f. **Ordinance Or Law –** Enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure; or requiring the demolition of any building or structure including the cost of removing its debris.

"We" do not pay for loss or increased cost regardless if the loss or increased cost is caused by or results from the:

1) enforcement of any code, ordinance, or law even if a building or structure has not been damaged; or
2) increased costs that "you" incur because of "your" compliance with a code, ordinance, or law during the construction, repair, rehabilitation, remodeling, or razing of a building or structure, including the removal of debris, following direct physical loss or damage to the property.

g. **Sewer, Septic Tank, Sump, Or Drain Backup And Water Below The Surface --** Except as provided under Supplemental Coverages - Sewer Backup:

1) water or waterborne material that backs up, overflows or is otherwise discharged through a sewer or drain, sump or septic tank, eaves trough or downspout; or

2) water or waterborne material below the surface of the ground, whether naturally or artificially occurring, including but not limited to water or waterborne material that exerts pressure on or flows, seeps, or leaks through or into a covered "installation project", sidewalk, driveway, foundation, swimming pool, or other structure.

But if sewer, drain, sump, septic tank, eaves trough, or downspout backup and water or waterborne material below the surface results in fire, explosion, or sprinkler leakage, "we" cover the loss or damage caused by that fire, explosion, or sprinkler leakage.

This exclusion does not apply to covered property while in transit.

h. **War And Military Action --**

1) War, including undeclared war or civil war; or
2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or
3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War And Military Action exclusion will apply in place of the Nuclear Hazard exclusion.

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

a. **Contamination Or Deterioration --** "We" do not pay for loss or damage caused by or resulting from contamination or deterioration, including but not limited to corrosion, decay, rust, or any quality, fault, or weakness in covered property that causes it to damage or destroy itself.

But if contamination or deterioration results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

b. **Criminal, Fraudulent, Dishonest, Or Illegal Acts** -- "We" do not pay for loss or damage caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by:

1) "you";
2) others who have an interest in the property;
3) others to whom "you" entrust the property;
4) "your" partners, officers, directors, trustees, joint venturers, or "your" members or managers if "you" are a limited liability company; or
5) the employees or agents of 1), 2), 3), or 4) above, whether or not they are at work.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for theft by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

c. **Defect, Weakness, Or Inadequacy In Materials** -- "We" do not pay for loss or damage caused by or resulting from a defect, weakness, inadequacy, fault, or unsoundness in materials.

But if a defect, weakness, inadequacy, fault, or unsoundness as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

d. **Defects, Errors, Or Omissions In Property** — "We" do not pay for loss or damage caused by or resulting from inherent defects, errors, or omissions in covered property (whether negligent or not) relating to:

1) design or specifications;
2) workmanship or construction; or
3) repair, renovation, or remodeling.

But if a defect, error or omission as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

e. **Delay In Completion And Increased Installation Costs** --

1) "We" do not pay for loss or damage caused directly or indirectly by a:

a) delay in the completion of installation, construction, or rigging of an "installation project" or any portion of a building or "installation project"; or

b) change in the sequence of installation, construction, or rigging of an "installation project" or any portion of a building or "installation project"

regardless of the cause of the delay in completion or change in sequence.

2) "We" also do not pay for increased installation or construction costs caused by or resulting from a delay in completion or change in sequence as described above under items e.1), a) and b). Increased installation or construction costs include, but are not limited to:

a) general conditions;
b) increased installation or construction costs and additional installation or construction expenses;
c) increased overhead, increased material costs, and increased labor costs;
d) soft costs; and
e) loss of earnings and loss of rental income.

3) General conditions means general conditions and extended general conditions including, but not limited to, costs of additional:

a) utility charges;
b) maintenance;
c) facilities;
d) communications; and
e) administrative personnel.

f. **Electrical Currents** -- "We" do not pay for loss or damage caused by or resulting from arcing or by electrical currents other than lightning.

But if arcing or electrical currents other than lightning result in a "specified peril", "we" do cover the loss or damage caused by that "specified peril".

g. **Loss Of Use And Consequential Loss** — "We" do not pay for loss or damage caused by or resulting from loss of use, delay, or loss of market. "We" also do not pay for any consequential loss or damage of any nature.

h. **Mechanical Breakdown** -- "We" do not pay for loss or damage caused by or resulting from:

1) mechanical breakdown; or
2) rupturing or bursting of moving parts of machinery caused by centrifugal force.

But if a mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force results in a "specified peril", "we" do cover the loss or damage caused by that "specified peril".

i. **Missing Property --** "We" do not pay for missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

This exclusion does not apply to covered property in the custody of a carrier for hire.

j. **Pollutants --** "We" do not pay for loss or damage caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of "pollutants":

1) unless the release, discharge, seepage, migration, dispersal, or escape is caused by a "specified peril"; or
2) except as specifically provided under the Supplemental Coverages - Pollutant Cleanup and Removal.

"We" do cover any resulting loss caused by a "specified peril".

k. **Steam Boiler Explosion --** "We" do not pay for loss or damage caused by or resulting from an explosion of steam boilers, steam pipes, steam turbines, or steam engines.

But if an explosion of steam boilers, steam pipes, steam turbines, or steam engines results in a fire or combustion explosion, "we" cover the loss or damage caused by that fire or combustion explosion. "We" also cover loss or damage caused by or resulting from the explosion of gas or fuel in a firebox, combustion chamber, or flue.

l. **Temperature/Humidity --** "We" do not pay for loss or damage caused by or resulting from dryness, dampness, humidity, or changes in or extremes of temperature.

But if dryness, dampness, humidity, or changes in or extremes of temperature results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

m. **Voluntary Parting --** "We" do not pay for loss or damage caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

n. **Wear And Tear --** "We" do not pay for loss or damage caused by or resulting from wear and tear, marring, or scratching.

But if wear and tear, marring, or scratching results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

**WHAT MUST BE DONE IN CASE OF LOSS**

1. **Notice --** In case of a loss, "you" must:

   a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice); and

   b. give notice to the police when the act that causes the loss is a crime.

2. **You Must Protect Property --** "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss.

   a. **Payment Of Reasonable Costs --** "We" do pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. "Our" payment of reasonable costs does not increase the "limit".

   b. **We Do Not Pay --** "We" do not pay for such repairs or emergency measures performed on property that has not been damaged by a peril insured against.

3. **Proof Of Loss --** "You" must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in title of the covered property during the policy period; and

   e. estimates, specifications, inventories, and other reasonable information that "we" may require to settle the loss.

4. **Examination --** "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Records --** "You" must produce records, including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

BC 923823 &1FR

6. **Damaged Property** -- "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

7. **Volunteer Payments** -- "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** -- "You" may not abandon the property to "us" without "our" written consent.

9. **Cooperation** -- "You" must cooperate with "us" in performing all acts required by this policy.

## VALUATION

1. **Cost To Repair, Replace, Or Rebuild** --

   a. **If Property Is Repaired, Replaced, Or Rebuilt** -- If covered property is repaired, replaced, or rebuilt, the value of covered property will be based on the reasonable and necessary costs and expenses "you" incur to repair, replace, or rebuild the covered property with materials of like kind and quality. The reasonable and necessary costs and expenses may include material, labor, reasonable overhead and profit, and delivery charges.

   b. **If Property Is Not Repaired, Replaced, Or Rebuilt** -- If covered property is not repaired, replaced, or rebuilt, the value of covered property will be based on the estimated reasonable and necessary costs that would have been incurred to repair, replace, or rebuild the covered property with material of like kind and quality.

   However, the value of covered property does not include any unincurred or estimated costs for overhead, profit, or delivery charges.

   c. **Payment Limitation** -- In no event will "we" pay more than the "limit" indicated on the "schedule of coverages".

2. **Pair Or Set** -- The value of a lost or damaged article that is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

3. **Loss To Parts** -- The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

## HOW MUCH WE PAY

1. **Insurable Interest** -- "We" do not pay for more than "your" insurable interest in any property.

2. **Deductible** -- "We" pay only that part of "your" loss over the deductible amount indicated on the "schedule of coverages" in any one occurrence.

3. **Loss Settlement Terms** -- Subject to paragraphs 1., 2., 4., 5., 6., and 7. under How Much We Pay, "we" pay the lesser of:

   a. the amount determined under Valuation;

   b. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

   c. the "limit" that applies to the covered property.

4. **Coinsurance** --

   a. **When Coinsurance Applies** -- "We" only pay a part of the loss if the "limit" is less than the percentage of the value of the covered property that is indicated on the "schedule of coverages".

   b. **How We Determine Our Part Of The Loss** -- "Our" part of the loss is determined using the following steps:

      1) multiply the percent indicated on the "schedule of coverages" by the value of the covered property at the time of loss;
      2) divide the "limit" for covered property by the result determined in b.1) above;
      3) multiply the total amount of loss, after the application of any deductible, by the result determined in b.2) above.

   The most "we" pay is the amount determined in b.3) above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

   c. **If There Is More Than One Limit** -- If there is more than one "limit" indicated on the "schedule of coverages" for this coverage part, this procedure applies separately to each "limit".

   d. **If There Is Only One Limit** -- If there is only one "limit" indicated on the "schedule of coverages" for this coverage, this procedure applies to the total of all covered property to which the "limit" applies.

   e. **When Coinsurance Does Not Apply** -- Conditions for coinsurance do not apply unless a coinsurance percentage is indicated on the "schedule of coverages".

BCP 05 11

5. **Catastrophe Limit** – The most "we" pay in any one occurrence is the Catastrophe Limit indicated on the "schedule of coverages" regardless if an occurrence or loss involves:

   a. one or more "installation projects";

   b. one or more "jobsites"; or

   c. any combination of "installation projects", "jobsites", or coverages described under Coverage Extensions or Supplemental Coverages.

6. **Insurance Under More Than One Coverage** – If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

7. **Insurance Under More Than One Policy** –

   a. **Proportional Share** – "You" may have another policy subject to the same "terms" as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

   b. **Excess Amount** – If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit".

**LOSS PAYMENT**

1. **Loss Payment Options** --

   a. **Our Options** – In the event of loss covered by this coverage form, "we" have the following options:

      1) pay the value of the lost or damaged property;
      2) pay the cost of repairing or replacing the lost or damaged property;
      3) rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or
      4) take all or any part of the property at the agreed or appraised value.

   b. **Notice Of Our Intent To Rebuild, Repair, Or Replace** – "We" must give "you" notice of "our" intent to rebuild, repair, or replace within 30 days after receipt of a duly executed proof of loss.



2. **Your Losses** –

   a. **Adjustment And Payment Of Loss** -- "We" adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy.

   b. **Conditions For Payment Of Loss** -- An insured loss will be payable 30 days after:

      1) a satisfactory proof of loss is received; and
      2) the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us".

3. **Property Of Others** --

   a. **Adjustment And Payment Of Loss To Property Of Others** -- Losses to property of others may be adjusted with and paid to:

      1) "you" on behalf of the owner; or
      2) the owner.

   b. **We Do Not Have To Pay You If We Pay The Owner** – If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits brought by the owners at "our" expense.

**OTHER CONDITIONS**

1. **Appraisal** – If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

   If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

   The appraisers will then determine and state separately the amount of each loss.

   The appraisers will also determine the value of covered property items at the time of the loss, if requested.

   If the appraisers submit a written report of any agreement to "us", the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three, sets the amount of the loss.

5 11

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

BC 923823 &1FR

Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us".

2. **Benefit To Others** -- Insurance under this coverage will not directly or indirectly benefit anyone having custody of "your" property.

3. **Conformity With Statute** — When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

4. **Estates** -- This provision applies only if the insured is an individual.

   a. **Your Death** — On "your" death, "we" cover the following as an insured:

      1) the person who has custody of "your" property until a legal representative is qualified and appointed; or
      2) "your" legal representative.

      This person or organization is an insured only with respect to property covered by this coverage.

   b. **Policy Period Is Not Extended** -- This coverage does not extend past the policy period indicated on the declarations.

5. **Misrepresentation, Concealment, Or Fraud** -- This coverage is void as to "you" and any other insured if, before or after a loss:

   a. "you" or any other insured have willfully concealed or misrepresented:

      1) a material fact or circumstance that relates to this insurance or the subject thereof; or
      2) "your" interest herein.

   b. there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

6. **Policy Period** -- "We" pay for a covered loss that occurs during the policy period.

7. **Recoveries** — If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

   a. "you" must notify "us" promptly if "you" recover property or receive payment;

   b. "we" must notify "you" promptly if "we" recover property or receive payment;

   c. any recovery expenses incurred by either are reimbursed first;

   d. "you" may keep the recovered property but "you" must refund to "us" the amount of the claim paid or any lesser amount to which "we" agree; and

   e. if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be prorated between "you" and "us" based on "our" respective interest in the loss.

8. **Restoration Of Limits** — Except as indicated under Coverage Extensions - Limited Fungus Coverage, a loss "we" pay under this coverage does not reduce the applicable "limits".

9. **Subrogation** — If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" do not pay for a loss if "you" impair this right to recover.

   "You" may waive "your" right to recover from others in writing before a loss occurs.

10. **Suit Against Us** — No one may bring a legal action against "us" under this coverage unless:

   a. all of the "terms" of this coverage have been complied with; and

   b. the suit has been brought within two years after "you" first have knowledge of the loss.

   ~~~~~~~~~~~~~~~able law makes this limitation ~~~~~~~ suit must begin within the shortest ~~~~~~~~itted by law.

11. **Territorial Limits** — "We" cover property while it is in the United States of America, its territories and possessions, Canada, and Puerto Rico.

12. **Carriers For Hire** — "You" may accept bills of lading or shipping receipts issued by carriers for hire that limit their liability to less than the actual cash value of the covered property.

## ADDITIONAL COVERAGE LIMITATIONS

**When Coverage Ceases** — Coverage ends when one of the following occurs:

1. this policy expires or is canceled;

2. the covered "installation project" is accepted by the purchaser;

3. "your" insurable interest in the covered property ceases;

4. "you" abandon the "installation project" with no intent to complete it;

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

5.  the "installation project" has been completed for more than 30 days; or

6.  the covered property has been put to its intended use. However, this does not apply to roofs or walls.

## DEFINITIONS

1.  "Earth movement" means:

    a.  earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

    b.  landslide, mudslide, or mudflow;

    c.  mine subsidence whether or not the non-natural mine is currently in use;

    d.  any other movement of earth, including sinking (other than "sinkhole collapse"), shifting, or rising of earth including, but not limited to, erosion, expansion, shrinking, freezing, thawing, improper soil compaction, and movement of water under the surface of the ground that cause cracking, settling, or shifting of foundations, buildings, or structures; or

    e.  eruption, explosion, or effusion of a volcano.

2.  "Flood" means an overflowing or inundation by water of an area that was previously and normally dry or not covered by water, whether caused artificially or naturally, by human or animal forces or by an act of nature. "Flood" includes, but is not limited to:

    a.  overflow of inland or tidal waters, waves, tidal waves, or tsunamis, or spray that results from any of these, all whether driven by wind or not, including but not limited to storm surge;

    b.  unusual and rapid accumulation or runoff of surface waters from any source; or

    c.  mudslides or mudflows if caused by:

        1)  unusual and rapid accumulation or runoff of surface waters or waves; or
        2)  currents of water exceeding anticipated cyclical levels.

3.  "Fungus" means:

    a.  a fungus, including but not limited to mildew and mold;

    b.  a protist, including but not limited to algae and slime mold;

    c.  wet rot and dry rot;

    d.  a bacterium; or

    e.  a chemical, matter, or compound produced or released by a fungus, a protist, wet rot, dry rot, or a bacterium, including but not limited to toxins, spores, fragments, and metabolites such as microbial volatile organic compounds.

4.  "Installation project" means an installation or construction project including, but not limited to, a repair or maintenance project that involves the installation, construction, or rigging of materials, supplies, fixtures, machinery, or equipment.

5.  "Jobsite" means any location, project, or work site where "you" are involved in the installation, construction, or rigging of materials, supplies, fixtures, machinery, or equipment.

6.  "Limit" means the amount of coverage that applies.

7.  "Pollutant" means:

    a.  any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of; and

    b.  electrical or magnetic emissions, whether visible or invisible, and sound emissions.

8.  "Schedule of coverages" means:

    a.  all pages labeled "schedule of coverages" or schedules that pertain to this coverage; and

    b.  declarations or supplemental declarations that pertain to this coverage.

9.  "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

10. "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

    Falling objects does not include loss to:

    a.  personal property in the open; or

    b.  the interior of buildings or structures or to personal property inside buildings or structures unless the exterior of the roofs or walls are first damaged by a falling object.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

BC 923823  &1FR

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

11. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

12. "Volcanic action" means airborne volcanic blast or airborne volcanic shock waves; ash, dust, or particulate matter; or lava flow.

"Volcanic action" does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the covered property.

K. **Major Loss Assistance** - If "we" insure "your" building and a covered loss to the building exceeds 50 percent of the building coverage, "we" will:

a. waive "your" next annual renewal premium
b. waive "your" deductible for this loss
c. Pay "you" up to $250 to advertise after "your" business" has re-opened.

L. **Money and Securities Coverage**

MONEY AND SECURITIES COVERAGE INSIDE AND OUTSIDE OF PREMISES

**AGREEMENT**

"We" provide the "theft", disappearance, or destruction coverage described below, subject to the "terms" of the General Conditions Part -- Crime Coverage. This coverage is also subject to the "declarations" and additional conditions that relate to assignment, cancellation, change, modification or waiver of policy "terms", inspections, and examination of books and records.

**ADDITIONAL DEFINITIONS**

The following additional definitions apply to the coverage provided by this coverage part:

1. "Banking location" means the interior of any building or part of a building occupied by a banking institution or similar safe depository.

2. "Messenger" means "you", any of "your" partners, or any of "your" employees while having care and custody of the property outside the described building.

3. "Occurrence" means an act or a series of related acts involving one or more persons.

4. "Theft" means an act of stealing, including burglary and robbery.

**PROPERTY COVERED**

"We" cover "your" bullion, lottery tickets, "money" and "securities" for loss caused by the perils covered while:

1. inside a building described on the "declarations" or while inside a "banking location"; or

2. in the care and custody of either a "messenger" or an armored motor vehicle company outside a building described on the "declarations" or outside a "banking location".

This coverage is limited to property that "you" own, hold, or for which "you" are legally liable.

The most that "we" will pay in any "occurrence" is:

| | Limit of Insurance | Deductible |
|---|---|---|
| Inside the premises | $10,000 | $250.00 |
| Outside the premises | $5,000 | $250.00 |

**EXTENSION OF COVERAGE**

The following extension of coverage does not increase the "limit" shown on the "declarations" for "money" and "securities".

"We" will also cover loss of, and loss from damage to a locked safe, vault, cash register, cash box, or cash drawer resulting directly from an actual or attempted "theft" of or unlawful entry into such containers located inside a building described on the "declarations".

**PERILS COVERED**

"We" cover loss of or damage to covered property caused by "theft", disappearance, or destruction.

**PERILS EXCLUDED**

1. "We" do not pay for loss if one or more of the following exclusions apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

a. **Civil Authority** – "We" do not pay for loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

b. **Nuclear Hazard** – "We" do not pay for loss caused by a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by, contributed to, or aggravated by a covered peril; and whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke.

Based on copyrighted material of AAIS

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

BCP 05 11

c. **War** – "We" do not pay for loss caused by war. This means:

1) declared war, undeclared war, civil war, insurrection, rebellion, or revolution;
2) a warlike act by a military force or by military personnel;
3) the destruction, seizure, or use of the property for a military purpose; or
4) the discharge of a nuclear weapon, even if it is accidental.

2. "We" do not pay for loss if one or more of the following exclusions apply to the loss:

a. **Accounting or Arithmetical Errors or Omissions** – "We" do not pay for loss resulting from accounting or arithmetical errors or omissions.

b. **Criminal, Fraudulent, or Dishonest Acts** – "We" do not pay for loss caused by criminal, fraudulent, dishonest, or illegal acts, alone or in collusion with another, by:

1) "you";
2) others to whom "you" entrust the property;
3) "your" partners, officers, directors, trustees, joint venturers; or
4) the employees or agents of 1), 2), or 3) above, whether or not they are at work.

c. **Fire** – "We" do ~~f~~ ?? building resultin~~g~~

d. **Increased Hazard** – "We" do not pay for loss that occurs while the hazard has been materially increased by any means within "your" knowledge or "your" control.

e. **Money Operated Devices** – "We" do not pay for loss of "money" that is taken from a "money" operated device, unless the "money" deposited is recorded by a continuous recording instrument in the device.

f. **Protective Safeguards** – "We" do not pay for losses that occur while protective safeguards that "you" control are not in working condition. This exclusion applies only to protective safeguards shown on the "declarations" and to the property, premises, and perils affected by the safeguards. This suspension lasts until the safeguards are back in working order. However, this exclusion will not apply if "you" maintain at least one watchperson while the premises described on the "declarations" is closed for business.

g. **Transfer** – "We" do not pay for loss of "money" or "securities" after they have been transferred or surrendered to a person or place outside the premises based upon unauthorized instructions or as a result of a threat to do bodily harm or damage property.

However, this exclusion does not apply to property outside the premises in the care and custody of a "messenger" if "you" had no knowledge of any directly related threat at the time the "messenger" left the described building.

h. **Unattended Vehicles** – "We" do not pay for loss of property from unattended vehicles while in the care and custody of a "messenger", unless the loss results from forced entry into the vehicle or forced entry of a securely locked compartment. There must be visible evidence that entry was forced.

i. **Vandalism** – "We" do not pay for loss caused by willful or malicious damage, or destruction of any property.

j. **Voluntary Parting** – "We" do not pay for loss caused by or resulting from voluntary parting with title or possession of any property because of any fraudulent scheme, trick, or false pretense.

## LOSS PAYMENT

The following provisions are added:

1. **Loss Inside The Premises** – The most "we" will pay for a loss occurring inside of a building described on the "declarations" or within a "banking location", is the "limit" shown for inside the premises shown on the "declarations".

2. **Loss Outside The Premises** – The most "we" will pay for a loss outside of a building described on the "declarations" or outside a "banking location" is the "limit" shown for outside the premises on the "declarations" at any location within the "basic territory".

M. **Personal Effects** - Under Supplemental Coverages, the coverage extension limit is changed from $500 to $2500. The limitation on property owned by any one person is changed from $100 to $500.

N. **Personal Property-Off Premises** - Under Supplemental Coverages the coverage extension limit is changed from $5000 to $10,000.

O. **Property in Transit** - Under Supplemental Coverages, the coverage extension limit is changed from $1000 to $5000. There is no coverage for contractors tools.

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

BCP 05 11

**P. Valuable Papers and Records - Research Costs -** Under Supplemental Coverages, the coverage extension limit is changed from $1000 to $5000.

**Q. Water Damage -** In the Special Perils Part, the sewer or drain exclusion in the Water section is amended as follows:

"We" cover up to $2,500 for water which backs up through sewer or drains.

**R. Additional Exclusions That Apply To Property Damage Liability**

Exclusion 4 is amended as follows:

"We" pay up to $2500 for property damage to property in the care, custody or control of an insured, subject to a deductible of $250. This exclusion does not apply with respect to liability assumed under a written sidetrack agreement.

**S. Non-Owned Auto Liability Coverage/Hired Auto Liability Coverage**

The Commercial Liability Coverage is amended as follows:

**Principal Coverages**

<u>Non-Owned Auto Liability</u>
Coverage L is extended to apply to "bodily injury" or "property damage" arising out of the use of a "non-owned auto" in "your" business by a person other than "you".

<u>Hired Auto Liability</u>
Coverage L is extended to apply to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by "you" or "your" "employees" in the course of "your" business.

<u>Definitions</u>
1. With respect to the coverage provided by this endorsement, the definition of "insured" is deleted and replaced by the following:

   a. "Insured" means:

     1) "you";
     2) any other person using a "hired auto" with "your" permission;
     3) with respect to a "non-owned auto", "your" partners, "your" executive officers, or "your" managers (if "you" are a limited liability company), but only while the "non-owned auto" is used in "your" business; and
     4) any other person or organization, but only with respect to their liability because of acts or omissions of an "insured" under 1.a.1), 1.a.2), and 1.a.3) above.

   b. None of the following is an "insured":

     1) any person engaged in the business of his or her employer for "bodily injury" to any fellow "employee" of such person injured in the course of employment, or consequential injury to a spouse, child, parent, brother, or sister of such fellow "employee", or of an obligation to fully or partially reimburse a third party for "damages" because of the injury;
     2) any partner, executive officer, or manager (if "you" are a limited liability company), with respect to an "auto" owned by such partner, officer, or manager or a member of his or her household;
     3) any person while employed in or otherwise engaged in duties in connection with an "auto business", other than an "auto business" operated by "you"; and
     4) the owner or lessee (of whom "you" are a sublessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee.

No person or organization is an "insured" with respect to the conduct of a current or past partnership, joint venture, or limited liability company that is not named on the "declarations" as an "insured".

2. With respect to the coverage provided by this endorsement, the following definitions are added:

   a. "Auto business" means the business or occupation of selling, repairing, servicing, storing, or parking "autos".
   b. "Hired auto" means an "auto" "you" lease, hire, or borrow on an occasional or infrequent basis. It does not include an "auto" "you" lease, hire, or borrow from:

     1) any of "your" "employees" or members of their households; or
     2) any of "your" partners, executive officers, or managers (if "you" are a limited liability company) or members of their households.

   c. "Non-owned auto" means any "auto" "you" do not own, lease, hire, or borrow which is used in connection with "your" business. If "you" are a partnership, a "non-owned auto" does not include any "auto" owned by any partner.

<u>Exclusions</u>
1. With respect to the coverage provided by this endorsement, the exclusions relating to "bodily injury" or "property damage" that arises out of "autos", aircraft, watercraft, mobile equipment, or "motorized vehicles" do not apply.

2. With respect to the coverage provided by this endorsement, the exclusion relating to rendering or failing to render professional services does not apply.

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

3. With respect to the coverage provided by this endorsement, the exclusion relating to liquor liability does not apply.

4. With respect to the coverage provided by this endorsement, the exclusion relating to "bodily injury" to an "employee" is replaced by the following:

"We" do not pay for:

a. "bodily injury" to an "employee" of the "insured" if it occurs in the course of employment by the "insured"; or

b. consequential injury to a spouse, child, parent, brother, or sister of such injured "employee".

This exclusion applies where the "insured" is liable either as an employer or in any other capacity; or there is an obligation to fully or partially reimburse a third person for "damages" arising out of paragraph 4.a. or 4.b. above.

This exclusion does not apply to:

a. liability assumed by the "insured" under a contract covered under Incidental Contractual Liability Coverage or Contractual Liability Coverage; or

b. "bodily injury" arising out of and in the course of domestic employment by the "insured" unless benefits for such injury are in whole or in part either payable or required to be provided under any workers' compensation law.

**Additional Exclusions That Apply Only To Property Damage**

With respect to the coverage provided by this endorsement, the exclusions in this section are deleted and replaced by the following:

1. "We" do not pay for "property damage" to property owned or being transported by, or rented, leased, or loaned to the "insured".

2. "We" do not pay for "property damage" to property in the care, custody, or control of the "insured".

 Based on copyrighted material of AAIS
ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

AAIS

CP-12
Ed 1.0

# BUILDING AND PERSONAL PROPERTY COVERAGE PART

**We** cover direct physical loss to covered property at the premises described on the **declarations** caused by a covered peril.

## PROPERTY COVERED

We cover the following types of property for which a **limit** is shown on the **declarations**.

### BUILDING PROPERTY

This means buildings and structures described on the **declarations**, including:

1. completed additions;

2. fixtures, machinery, and equipment which are a permanent part of the described building or structure;

3. outdoor fixtures;

4. personal property owned by **you** and used to maintain or service the described building or structure or its premises, including air-conditioning equipment; fire extinguishing apparatus; floor coverings; and appliances for refrigerating, cooking, dish washing, and laundering;

5. if not covered by other insurance;

   a. additions under construction, alterations, and repairs to the building or structure; and

   b. materials, equipment, supplies, and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations, or repairs to the building or structure.

### BUSINESS PERSONAL PROPERTY

This means **your** business personal property in the buildings and structures described on the **declarations** or in the open (or in vehicles) on or within 100 feet of the described premises. Unless otherwise specified on the **declarations**, this includes:

1. **your** interest in personal property of others to the extent of **your** labor, material, and services;

2. **your** use interest as tenant in improvements to the described building or structure. Improvements are fixtures, alterations, installations, or additions:

   a. to a building or structure **you** occupy but do not own; and

   b. made or acquired at **your** expense and which cannot be legally removed by **you;** and

3. leased personal property which **you** have a contractual responsibility to insure, unless otherwise insured by the Commercial Property Coverage under Personal Property of Others.

### PERSONAL PROPERTY OF OTHERS

This means personal property of others:

1. that is in **your** care, custody, or control; and

2. located in the buildings and structures described on the **declarations** or in the open (or in vehicles) on or within 100 feet of the described premises.

However, **our** payment for loss to personal property of others is only for the benefit of the owners of the personal property.

## PROPERTY EXCLUDED AND LIMITATIONS

1. **Animals** -- **We** do not cover animals, including birds and fish, unless owned by others and boarded by **you**. **We** do cover animals **you** own and hold for sale.

2. **Antennas, Awnings, Canopies, Fences, and Signs** -- Except as provided under Supplemental Coverages, **we** do not cover outdoor:

   a. radio, television, satellite, dish-type, or other antennas including their masts, towers, and lead-in wiring;

   b. awnings or canopies of fabric or slat construction or their supports;

   c. fences; or

   d. signs, other than signs attached to buildings.

-- 1 --

AAIS

Copyright MCMXCIV, American Association of Insurance Services
ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

3. **Contraband** -- **We** do not c    ' contraband or property in the course of illegal transportation or trade.

4. **Foundations, Retaining Walls, Piling, Piers, Wharves, or Docks** -- **We** do not cover foundations which are below the lowest basement floor or below ground level if there is no basement; retaining walls that are not part of buildings or structures; or pilings, piers, wharves, or docks.

5. **Land; Water; Growing Crops or Lawns; Cost of Excavation, Grading, or Filling; Paved Surfaces; or Underground Pipes, Flues, or Drains** -- **We** do not cover:

   a. land, including land on which the property is located;

   b. underground or surface water;

   c. growing crops or lawns;

   d. cost of excavations, grading, or filling;

   e. paved outdoor surfaces, including driveways, parking lots, roads, bridges, and walks; or

   f. underground pipes, flues, and drains.

6. **Money and Securities** -- **We** do not cover accounts, bills, currency, food stamps, or other evidences of debt, lottery tickets not held for sale, money, notes, or securities.

7. **Property More Specifically Insured** -- **We** do not cover property which is more specifically insured in whole or in part by any other insurance. **We** do cover the amount in excess of the amount due from the more specific insurance.

8. **Trees, Shrubs, and Plants** -- Except as provided under Supplemental Coverages, **we** do not cover trees; shrubs; plants; and grain, hay, straw, or other crops, when outdoors. However, **we** do cover trees, shrubs, and plants **you** own and hold for sale.

9. **Valuable Papers and Records -- Research Cost-** - Except as provided under Supplemental Coverages, **we** do not cover the cost to research, replace, or restore the information on valuable papers and records, including those which exist on electronic or magnetic media.

10. **Vehicles, Aircraft, and Watercraft** -- **We** do not cover vehicles or self-propelled machines (including aircraf    : watercraft and their motors, equipment, and accessories) that are:

    a. required to be licensed for use on public roads; or

    b. operated principally away from the described premises.

    **We** do cover vehicles or self-propelled machines **you** manufacture, process, warehouse, or hold for sale. However, this does not include autos **you** hold for sale. **We** also cover rowboats or canoes out of water at the described premises.

## ADDITIONAL COVERAGES

1. **Debris Removal** -- **We** cover the cost to remove the debris of covered property that is caused by a covered peril. This coverage does not include costs to:

   a. extract **pollutants** from land or water; or

   b. remove, restore, or replace polluted land or water.

   **We** do not pay any more under this coverage than 25 percent of the amount **we** pay for the direct physical loss. **We** do not pay more for loss to property and debris removal combined than the **limit** for the damaged property.

   However, **we** pay an additional amount of debris removal expense up to $5,000 when the debris removal expense exceeds 25 percent of the amount **we** pay for direct physical loss or when the loss to property and debris removal combined exceeds the **limit** for the damaged property.

   **We** do not pay any expenses unless they are reported to **us** in writing within 180 days from the date of direct physical loss to covered property.

2. **Emergency Removal** -- **We** cover loss to covered property while moved or being moved from the described premises for preservation from loss caused by a covered peril. **We** pay for any direct physical loss to that property. This coverage applies for up to 10 days after the property is first moved. This does not increase the **limit**.

3. **Fire Department Service Charges** -- **We** pay up to $1,000 to cover **your** liability, assumed by contract or agreement prior to the loss, for fire department service charges.

This coverage is limited to c[...]es incurred when the fire department is called to save or protect covered property from a covered peril.

No deductible applies.

This is an additional **limit**.

4. **Pollutant Clean Up and Removal -- We** pay **your** expense to extract **pollutants** from land or water at the described premises if the discharge, dispersal, seepage, migration, release, or escape of the **pollutants** is caused by a covered peril that occurs during the policy period.

**We** pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of **pollutants** only when the expense of extracting the **pollutants** is covered by this Additional Coverage.

The most **we** pay for each described premises is $10,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12 month period of this policy. The expenses are paid only if they are reported to **us** in writing within 180 days from the date the covered peril occurs.

This is an additional **limit**.

## PERILS COVERED

See the applicable Perils Part shown on the **declarations**.

## SUPPLEMENTAL COVERAGES

If a Coinsurance percentage of 80% or more is shown on the **declarations**, we provide the following supplemental coverages.

Unless otherwise stated, each supplemental coverage:

a. applies for loss caused by a covered peril;

b. applies to property in or on buildings or structures described on the **declarations** or in the open (or in vehicles) within 100 feet of the described premises;

c. is an additional amount of coverage; and

d. is not subject to and not considered in applying coinsurance.

1. The following s[...]lemental coverages apply when a **limit** is shown on the **declarations** for either Building Property or Business Personal Property.

a. **Antennas, Awnings, Canopies, Fences, and Signs -- We** pay up to $1,000 for **your** outdoor:

1) radio, television, satellite, dish-type, or other antennas including their masts, towers, and lead-in wiring;
2) awnings or canopies of fabric or slat construction or their supports;
3) fences; or
4) signs.

**We** only cover direct physical loss caused by aircraft, civil commotion, explosion, fire, lightning, or riot, including debris removal expense.

b. **Property Off Premises -- We** pay up to $5,000 for covered property while temporarily at a location that **you** do not own, control, rent, or lease.

This coverage does not include property:

1) in or on a vehicle;
2) in the care, custody, or control of **your** salesperson; or
3) at any fair or exhibition.

2. The following supplemental coverages apply only when a **limit** is shown on the **declarations** for Building Property.

a. **Increased Costs -- Ordinance or Law -- We** pay up to $5,000 for each described premises to cover the increased costs of a covered loss, including debris removal expense, resulting from the enforcement of any ordinance, law, or decree that regulates or requires:

1) the construction, use, or repair of any property; or
2) the demolition of any property, in part or in whole, not damaged by a covered peril.

The ordinance, law, or decree must be in force at the time of loss.

Under Perils Excluded, Ordinance or Law does not apply to this Supplemental Coverage.

b. **Newly Acquired Buildings -- We** cover **your** buildings or structures being built or that **you** acquire during the policy period.

This coverage applies for 30 days after construction is started or for 30 days from the date **you** acquire the building or structure; or until **you** report the newly acquired property to **us**; whichever occurs first. This coverage does not extend beyond the end of the policy period.

**You** must pay any additional premium due from the date construction is started or the date **you** acquire the property.

**We** pay up to 25 percent of the **limit** shown on the **declarations** for Building Property but not exceeding $250,000 for each building or structure.

c. **Trees, Shrubs, and Plants --** **We** pay up to $1,000 for **your** outdoor trees, shrubs, and plants not held for sale. **We** only cover loss caused by aircraft, civil commotion, explosion, fire, lightning, or riot. This coverage is limited to $250 on any one tree, shrub, or plant, including debris removal.

3. The following supplemental coverages apply only when a **limit** is shown on the **declarations** for Business Personal Property.

a. **Condominium Units --** If the described premises is a condominium unit that **you** own, **we** cover the fixtures, improvements, and alterations within **your** unit.

   **We** pay up to 10 percent of the **limit** shown on the **declarations** for Business Personal Property but not exceeding $20,000 for each building or structure.

   This is not an additional amount of coverage.

b. **Extra Expenses --** **We** pay up to $1,000 for the necessary extra expenses that **you** incur in order to continue as nearly as practical **your** normal business following loss by a covered peril. This applies when the damage is to property in the described buildings or structures or in the open (or in vehicles) on or within 100 feet of the described premises.

   **We** cover **your** extra expenses for the time it should reasonably take to resume **your** normal business, but not longer than the time it should reasonably take to rebuild, repair, or replace the property that has incurred the loss.

**We** do not cover the normal cost of repair, replacement, or restoration of property. **We** cover expenses in excess of normal that **you** necessarily incur to reduce loss, but only to the extent they reduce the loss under this coverage.

**We** do not cover the cost of research or other extra expense necessary to reproduce, replace, or restore lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media.

**We** cover expenses in excess of normal that **you** necessarily incur to reduce loss, but only to the extent that they reduce the loss under this coverage.

c. **Personal Effects --** **We** pay up to $500, at each described premises, for personal effects owned by **you, your** officers, **your** partners, or **your** employees. This coverage is limited to $100 on property owned by any one person.

d. **Personal Property -- Acquired Locations --** **We** cover **your** business personal property at locations that **you** acquire, other than fairs or exhibitions.

   This coverage applies for 30 days from the date **you** acquire the location or until **you** report the acquired location to **us**, whichever occurs first. This coverage does not extend beyond the end of the policy period.

   **You** must pay any additional premium due from that date **you** acquire the location.

   **We** pay up to 10 percent of the **limit** shown on the **declarations** for Business Personal Property but not exceeding $100,000 for each location.

e. **Personal Property of Others --** **We** pay up to $2,500, at each described premises, for personal property of others in **your** care, custody, or control. This coverage is only for the benefit of the owners of the personal property.

f. **Property in Transit --** **We** pay up to $1,000 for covered business personal property (other than property in the care, custody, or control of **your** salesperson) in transit more than 100 feet from the described premises in vehicles **you** own, lease, or operate.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

We only cover direct phy....l loss caused by civil commotion; collision with another vehicle or object, other than the road bed; explosion, fire; hail; lightning; overturn or upset of the vehicle; riot; vandalism; or windstorm.

This coverage also includes loss of an entire package, case, or bale from within a locked part of **your** vehicle caused by theft. Theft must be proven by visible marks of forced entry.

g. **Valuable Papers and Records -- Research Cost -- We** pay up to $1,000 for the cost of research or other expenses necessary to reproduce, replace, or restore lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice** -- In case of a loss, **you** must:

   a. give **us** or **our** agent prompt notice including a description of the property involved (we may request written notice);

   b. give notice to the police when the act that causes the loss is a crime; and

   c. give notice to the credit card company if the loss involves a credit card.

2. **Protect Property -- You** must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss. **We** pay the reasonable costs incurred by **you** for necessary repairs or emergency measures performed solely to protect covered property from further damage by a covered peril if a covered peril has already caused a loss to covered property. However, **we** do not pay for such repairs or emergency measures performed on property which has not been damaged by a covered peril. This does not increase **our limit**.

3. **Proof of Loss -- You** must send **us**, within 60 days after **our** request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. **your** interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in ( or occupancy of the covered property during the policy period;

   e. detailed estimates for repair or replacement of covered property;

   f. available plans and specifications of buildings or structures;

   g. detailed estimates of any covered loss of income and expenses; and

   h. an inventory of damaged and undamaged covered personal property showing in detail the quantity, description, cost, actual cash value, and amount of the loss. **You** must attach to the inventory copies of all bills, receipts, and related documents that substantiate the inventory. An inventory of undamaged personal property is not required if the total claim for a loss is less than $10,000 and less than five percent of the total **limit**.

4. **Examination Under Oath -- You** must submit to examination under oath in matters connected with the loss as often as **we** reasonably request and give **us** sworn statements of the answers. If more than one person is examined, **we** have the right to examine and receive statements separately and not in the presence of the others.

5. **Records -- You** must produce records, including tax returns and bank microfilms of all cancelled checks, relating to value, loss, and expense and permit copies and extracts to be made of them as often as **we** reasonably request.

6. **Damaged Property -- You** must exhibit the damaged and undamaged property as often as **we** reasonably request and allow **us** to inspect or take samples of the property.

7. **Volunteer Payments -- You** must not, except at **your** own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment -- We** do not have to accept any abandonment of property.

9. **Cooperation -- You** must cooperate in performing all acts required by the Commercial Property Coverage.

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

## VALUATION

1. **Actual Cash Value --** When replacement cost is not shown on the **declarations** for covered property, the value is based on the actual cash value at the time of the loss (with a deduction for depreciation), except as provided in paragraphs 2. through 9. below.

2. **Limited Replacement Cost --** When the **limit** for Building Property satisfies the coinsurance requirement, **we** pay up to $2,500 to cover the cost to repair or replace **your** buildings or structures. This applies only when the total loss does not exceed $2,500. This provision does not apply to awnings; canopies; floor coverings; appliances for refrigerating, ventilating, cooking, dishwashing, or laundering; or outdoor equipment or furniture.

3. **Glass --** The value of glass is based on the cost of safety glazing material where required by code, ordinance, or law.

4. **Merchandise Sold --** The value of merchandise that **you** have sold but not delivered is based on the selling price less all discounts and unincurred expenses.

5. **Valuable Papers and Records --** The value of valuable papers and records, including those which exist on electronic or magnetic media (other than prepackaged software programs) is based on the cost of blank materials, and the labor to transcribe or copy the records when there is a duplicate.

6. **Tenant's Improvements --** The value of tenant's improvements losses is based on the actual cash value if repaired or replaced at **your** expense within a reasonable time.

   The value of tenant's improvements losses is based on a portion of **your** original cost if not repaired or replaced within a reasonable time. This portion is determined as follows:

   a. Divide the number of days from the date of the loss to the expiration date of the lease by the number of days from the date of installation to the expiration date of the lease; and

   b. Multiply the figure determined in 6.a. above by the original cost.

   If **your** lease contains a renewal option, the expiration of the lease in this procedure is replaced by the expiration of the renewal option period.

Tenant's improvements losses are not covered if repaired or replaced at another's expense.

7. **Pair or Set --** The value of a lost or damaged article which is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

8. **Loss to Parts --** The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

9. **Replacement Cost --** When replacement cost is shown on the **declarations** for covered property, the value is based on replacement cost without any deduction for depreciation.

   This replacement cost provision does not apply to objects of art, rarity, or antiquity; property of others; or paragraphs 3. through 8. above.

   The replacement cost is limited to the cost of repair or replacement with similar materials on the same site and used for the same purpose. The payment shall not exceed the amount **you** spend to repair or replace the damaged or destroyed property.

   Except as provided under Limited Replacement Cost, replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced. **You** may make a claim for actual cash value before repair or replacement takes place, and later for the replacement cost if **you** notify **us** of **your** intent within 180 days after the loss.

## HOW MUCH WE PAY

1. **Insurable Interest --** **We** do not cover more than **your** insurable interest in any property.

2. **Deductible --** **We** pay only that part of **your** loss over the deductible amount stated on the **declarations** in any one occurrence. The deductible applies to the loss before application of any coinsurance or reporting provision.

3. **Loss Settlement Terms --** Subject to paragraphs 1., 2., 4., 5., and 6. under How Much We Pay, **we** pay the lesser of:

   a. the amount determined under Valuation;

   b. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

   c. the **limit** that applies to covered property.

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

4. **Coinsurance** -- When a coinsurance percentage is shown on the **declarations**, we only pay a part of the loss if the **limit** is less than the value of the covered property at the time of the loss multiplied by the coinsurance percentage shown for it on the **declarations**. **Our** part of the loss is determined using the following steps:

a. Multiply the value of the covered property at the time of the loss by the coinsurance percentage;

b. Divide the **limit** for covered property by the figure determined in 4.a. above; and

c. Multiply the total amount of loss, after the application of any deductible, by the figure determined in 4.b. above.

The most we pay is the amount determined in 4.c. above or the **limit**, whichever is less. **We** do not pay any remaining part of the loss.

If there is more than one **limit** shown on the **declarations** for this Coverage Part, this procedure applies separately to each **limit**.

If there is only one **limit** shown on the **declarations** for this Coverage Part, this procedure applies to the total of all covered property to which the **limit** applies.

**Example -- Underinsurance**

| | |
|---|---|
| Value of covered property | $100,000 |
| Coinsurance | 80% |
| **Limit** | $60,000 |
| Loss | $21,000 |
| Deductible | $1,000 |

Step a.: $100,000 x 80% = $80,000 (minimum limit needed to meet coinsurance requirements)

Step b.: $60,000 ÷ $80,000 = .75

Step c.: $21,000 - $1,000 = $20,000
$20,000 x .75 = $15,000

**We** pay no more than $15,000. **We** do not pay the remaining $6,000.

**Example -- Sufficient Insurance**

| | |
|---|---|
| Value of covered property | $100,000 |
| Coinsurance | 80% |
| **Limit** | $80,000 |
| Loss | $21,000 |
| Deductible | $1,000 |

Step a.: $100,000 x 80% = $80,000 (minimum limit needed to meet coinsurance requirements)

Step b.: $80,000 ÷ $80,000 = 1.00

Step c.: $21,000 - $1,000 = $20,000
$20,000 x 1.00 = $20,000

**We** pay no more than $20,000 in excess of the deductible. No penalty applies.

**Example -- Blanket Limit**

| | |
|---|---|
| Value of covered property | |
| Building at Location 1. | $75,000 |
| Building at Location 2. | $75,000 |
| Personal Property at Location 2. | $50,000 |
| Total Value of covered property | $200,000 |
| Coinsurance | 80% |
| **Limit** | $128,000 |
| Loss | |
| Building at Location 2. | $20,000 |
| Personal Property at Location 2. | $11,000 |
| Total Loss | $31,000 |
| Deductible | $1,000 |

Step a.: $200,000 x 80% = $160,000 (minimum limit needed to meet coinsurance requirements)

Step b.: $128,000 ÷ $160,000 = .80

Step c.: $31,000 - $1,000 = $30,000
$30,000 x .80 = $24,000

**We** pay no more than $24,000. **We** do not pay the remaining $7,000.

5. **Insurance Under More Than One Coverage** -- If more than one coverage of this policy insures the same loss, we pay no more than the actual claim or loss sustained.

6. **Insurance Under More Than One Policy** -- **You** may have another policy subject to the same plan, **terms**, conditions, and provisions as this policy. If **you** do, we pay **our** share of the covered loss. **Our** share is the proportion that the applicable **limit** under this policy bears to the **limit** of all policies covering on the same basis.

If there is another policy covering the same loss, other than that described above, **we** pay only for the amount of covered loss in excess of the amount due from that other policy, whether **you** can collect on it or not. But **we** do not pay more than the applicable **limit**.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

## LOSS PAYMENT

1. **Our Options -- We** may:

   a. pay the value of the loss;

   b. pay the cost of repairing or replacing the loss;

   c. rebuild, repair, or replace with property of equivalent kind and quality, to the extent practicable; or

   d. take all or any part of the damaged property at the agreed or appraised value.

   **We** must give **you** notice of **our** intentions within 30 days after we have received a satisfactory proof of loss.

2. **Your Losses -- We** adjust all losses with **you.** Payment is made to **you** unless another loss payee is named in the policy. A covered loss is payable 30 days after a satisfactory proof of loss is received, and:

   a. the amount of the loss has been agreed to in writing;

   b. an appraisal award has been filed with **us**; or

   c. a final judgment has been entered.

3. **Property of Others --** Losses to property of others may be adjusted with and paid to:

   a. **you** on behalf of the owner; or

   b. the owner.

   If **we** pay the owner, **we** do not have to pay **you. We** may also choose to defend any suits arising from the owners at **our** expense.

## OTHER CONDITIONS

In addition to the policy **terms** which are contained in other sections of the Commercial Property Coverage, the following conditions apply.

1. **Appraisal -- If you** and **we** do not agree on the amount of the loss or the actual cash value of covered property, either party may demand that these amounts be determined by appraisal.

If either makes written demand for appraisal, each selects a competent, independent appraiser and notifies the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, **you** or **we** can ask a judge of a court of record in the state where the property is located to select an umpire.

The appraisers then determine and state separately the amount of each loss.

The appraisers also determine the actual cash value of covered property items at the time of the loss, if requested.

A written agreement is binding on all parties. If the appraisers fail to agree within a reasonable time, they submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three is binding on all parties.

Each appraiser is paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire is paid equally by **you** and **us.**

If there is an appraisal, **we** retain **our** right to deny the claim.

2. **Mortgage Provisions --** If a mortgagee (mortgage holder) is named in this policy, loss to Building Property shall be paid to the mortgagee and **you** as their interest appears. If more than one mortgagee is named, they shall be paid in order of precedence.

The insurance for the mortgagee continues in effect even when **your** insurance may be void because of **your** acts, neglect, or failure to comply with the coverage **terms.** The insurance for the mortgagee does not continue in effect if the mortgagee is aware of changes in ownership or substantial increase in risk and does not notify **us.**

If **we** cancel this policy, **we** notify the mortgagee at least 10 days before the effective date of cancellation if **we** cancel for **your** nonpayment of premium, or 30 days before the effective date of cancellation if **we** cancel for any other reason.

**We** may request payment of the premium from the mortgagee, if **you** fail to pay the premium.

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

If we pay the mortgagee fc loss where your insurance may be void, the mortgagee's right to collect that portion of the mortgage debt from you then belongs to us. This does not affect the mortgagee's right to collect the remainder of the mortgage debt from you. As an alternative, we may pay the mortgagee the remaining principal and accrued interest in return for a full assignment of the mortgagee's interest and any instruments given as security for the mortgage debt.

If we choose not to renew this policy, we give written notice to the mortgagee at least 10 days before the expiration date of this policy.

3. **Recoveries --** If we pay you for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

   a. **You** must notify **us** promptly if **you** recover property or receive payment.

   b. **We** must notify **you** promptly if **we** recover property, or receive payment.

   c. Any recovery expenses incurred by either are reimbursed first.

   d. **You** may keep the recovered property but **you** must refund to **us** the amount of the claim paid, or any lesser amount to which **we** agree.

   e. If the claim paid is less than the agreed loss due to a deductible or other limiting **term** of this

policy any i very is pro rated between **you** and **us** based on **our** respective interest in the loss.

4. **Vacancy -- Unoccupancy -- We** do not pay for loss caused by attempted theft, breakage of building glass, sprinkler leakage (unless **you** have protected the system against freezing), theft, vandalism, or water damage occurring while the building or structure has been:

   a. vacant for more than 60 consecutive days; or

   b. unoccupied for more than

      1) 60 consecutive days; or
      2) the usual or incidental unoccupancy period for the described premises

      whichever is longer.

The amount we pay for any loss that is not otherwise excluded is reduced by 15%.

Unoccupied means that the customary activities or operations of the described occupancy are suspended, but business personal property has not been removed. The building or structure shall be considered vacant and not unoccupied when the occupants have moved, leaving the building or structure empty or containing only limited business personal property. Buildings or structures under construction are not considered vacant or unoccupied.

ELECTRONICALLY FILED 11/06/2014 14:00  /  IFIJ  /  A 1406566  /  CONFIRMATION NUMBER 372036

AAIS

**CP-85**
**Ed 1.0**

# SPECIAL PERILS PART

## ADDITIONAL DEFINITIONS

1. **Sinkhole Collapse --** This means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

2. **Specified Perils --** This means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; **sinkhole collapse;** smoke; sonic boom; vandalism; vehicles; **volcanic action;** water damage; weight of ice, snow, or sleet; and windstorm.

   Falling objects does not include loss to personal property in the open or to the interior of buildings or structures or personal property inside buildings or structures unless the exterior of the roof or walls are first damaged by a falling object.

   Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

3. **Volcanic Action --** This means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow. It does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the covered property.

## PERILS COVERED

When "Special Perils" is shown on the **declarations,** we cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. **We** do not pay for loss if one or more of the following exclusions apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

   a. **Ordinance or Law --** **We** do not cover loss or increased cost caused by enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure; or requiring the demolition of any building or structure including the cost of removing its debris.

   b. **Earth Movement or Volcanic Eruption --** **We** do not cover loss caused by any earth movement (other than **sinkhole collapse**) or caused by eruption, explosion, or effusion of a volcano. Earth movement includes, but is not limited to earthquake; landslide; mudflow; mudslide; mine subsidence; or sinking, rising, or shifting of earth.

   **We** cover direct physical loss by fire, explosion, or **volcanic action** resulting from either earth movement or eruption, explosion, or effusion of a volcano.

   All volcanic eruptions that occur within a 168 hour period shall be considered a single loss.

   c. **Civil Authority --** **We** do not cover loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

   **We** cover loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this policy.

   d. **Nuclear Hazard --** **We** do not cover loss caused by a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by, contributed to or aggravated by a covered peril; and whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct physical loss by fire resulting from the nuclear hazard is covered.

   e. **Utility Failure --** **We** do not cover loss caused by interruption of power or other utility services resulting from any cause if the interruption takes place away from the described premises. Interruption includes reduced or increased voltage, low or high pressure, or other interruptions of normal services.

Copyright MCMXCIV, American Association of Insurance Services

We cover the direct physical loss by a covered peril which occurs on the described premises as a result of any power interruption.

f. **War -- We** do not cover loss caused by war. This means:

1) declared war, undeclared war, civil war, insurrection, rebellion, or revolution;
2) a warlike act by a military force or by military personnel;
3) the destruction, seizure, or use of the property for a military purpose; or
4) the discharge of a nuclear weapon, even if it is accidental.

g. **Water -- We** do not cover loss caused by water. This means:

1) flood, surface water, waves, tidal water, or the overflow of a body of water. This includes spray that results from these whether driven by wind or not;
2) water that backs up through a sewer or drain; and
3) water below the surface of the ground. This includes water that exerts pressure on or flows, seeps, or leaks through or into a building or structure, sidewalk, driveway, foundation, swimming pool, or other structure.

If fire, explosion, or sprinkler leakage results, we do cover the resulting loss.

2. **We** do not pay for loss if one or more of the following exclusions apply to the loss:

a. **Animals -- We** do not cover loss caused by animals, including birds, insects, or vermin. **We** cover any resulting loss caused by a **specified peril** or breakage of building glass.

b. **Collapse -- We** do not cover loss caused by collapse, except as provided in the Additional Coverage for Collapse. If loss caused by a covered peril results at the described premises, we pay for that resulting loss.

c. **Contamination or Deterioration -- We** do not cover loss caused by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust or any quality, fault, or weakness in property that causes it to damage or destroy itself. **We** cover any resulting loss caused by a **specified peril** or breakage of building glass.

d. **Criminal, Fraudulent, or Dishonest Acts -- We** do not cover loss caused by criminal, fraudulent, dishonest, or illegal acts, alone or in collusion with another, by:

1) **you;**
2) others who have an interest in the property;
3) others to whom **you** entrust the property;
4) **your** partners, officers, directors, trustees, joint adventurers; or
5) the employees or agents of 1), 2), 3), or 4) above, whether or not they are at work.

e. **Defects, Errors, and Omissions -- We** do not cover loss which results from one or more of the following;

1) an act, error, or omission (negligent or not) relating to:

a) land use;
b) the design, specification, construction, workmanship, installation, or maintenance of property;
c) planning, zoning, development, siting, surveying, grading, or compaction; or
d) maintenance of property (including land, structures, or improvements);

whether on or off the described premises;

2) a defect, a weakness, the inadequacy, a fault, or unsoundness in materials used in construction or repair, whether on or off the described premises;
3) the cost to make good an error in design; or
4) a data processing error or omission in programming or giving improper instructions.

In addition, **we** do not cover loss to Business Personal Property caused by deficiency or defects in design, specifications, materials, or workmanship, or caused by latent or inherent defects.

**We** cover any resulting loss caused by a covered peril unless the resulting loss itself is excluded.

f. **Electrical Currents -- We** do not cover loss caused by arcing or by electrical currents other than lightning. If a fire results, **we** cover only the loss caused by fire.

CP-85 Ed 1.0

-- 2 --

AAIS

g. **Explosion --** **We** do not cover loss caused by explosion of steam boilers, steam pipes, steam turbines, or steam engines that **you** own or lease or that are operated under **your** control. If a fire or combustion explosion results, **we** cover the resulting loss. **We** also cover loss caused by the explosion of gas or fuel in a firebox, combustion chamber, or flue.

h. **Freezing --** **We** do not cover loss caused by water, other liquids, powder, or molten material that leaks or flows from plumbing, heating, air-conditioning systems or appliances (other than fire protective systems) as a result of freezing. This does not apply if **you** use reasonable care to maintain heat in the building or structure; or **you** drain the equipment and turn off the supply if the heat is not maintained.

i. **Increased Hazard --** **We** do not cover loss occurring while the hazard has been materially increased by any means within **your** knowledge or **your** control.

j. **Loss of Use --** **We** do not cover loss caused by loss of use, business interruption, delay, or loss of market.

k. **Mechanical Breakdown --** **We** do not cover loss caused by mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force. **We** cover any resulting loss caused by a **specified peril**, breakage of building glass, or elevator collision.

l. **Neglect --** **We** do not cover loss caused by **your** neglect to use all reasonable means to save covered property at and after the time of loss.

We do not cover loss caused by **your** neglect to use all reasonable means to save and preserve covered property when endangered by a covered peril.

m. **Pollutants --** **We** do not cover loss caused by release, discharge, seepage, migration, dispersal, or escape of **pollutants** unless the release, discharge, seepage, migration, dispersal, or escape is caused by a **specified peril**. **We** cover any resulting loss caused by a **specified peril**.

n. **Seepage --** **We** do not cover loss caused by continuous or repeated seepage or leakage of water or steam that occurs over a period of 14 days or more.

o. **Settling, Cracking, Shrinking, Bulging, or Expanding --** **We** do not cover loss caused by settling, cracking, shrinking, bulging, or expanding of pavements, footings, foundations, walls, ceilings, or roofs. **We** cover any resulting loss caused by a **specified peril** or breakage of building glass.

p. **Smog, Smoke, Vapor, or Gas --** **We** do not cover loss caused by smog, smoke, vapor, or gas from agricultural smudging or industrial operations.

q. **Temperature/Humidity --** **We** do not cover loss to personal property caused by dampness, dryness, or changes in or extremes of temperature. **We** cover any resulting loss caused by **specified perils** or breakage of building glass.

r. **Voluntary Parting --** **We** do not cover loss caused by voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

s. **Wear and Tear --** **We** do not cover loss caused by wear and tear, marring, or scratching. **We** cover any resulting loss caused by a **specified peril** or breakage of building glass.

t. **Weather --** **We** do not pay for loss caused by weather conditions if the weather conditions contribute in any way with a cause or event excluded in paragraph 1. above.

We cover any resulting loss caused by a covered peril unless the resulting loss itself is excluded.

## ADDITIONAL PROPERTY EXCLUDED AND LIMITATIONS

1. **Animals --** **We** do not cover loss to animals, including birds and fish, except death or destruction of animals caused by **specified perils** or breakage of building glass.

2. **Boilers --** **We** do not cover loss to steam boilers, steam pipes, steam turbines, or steam engines caused by any condition or occurrence within such equipment. **We** do cover loss to such equipment caused by the explosion of gas or fuel in a firebox, combustion chamber, or flue.

We do not cover loss to hot water boilers or heaters caused by any condition or occurrence within such equipment other than explosion. This exclusion includes bursting, cracking, exploding, or rupturing.

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036

3. **Building Materials -- We** do not cover loss to building materials and supplies that are not attached to buildings or structures, unless held for sale by **you,** caused by theft.

   **We** cover loss caused by looting and pillaging at the time and place of a riot or civil commotion.

4. **Furs -- We** do not cover furs or fur garments for loss by theft for more than $2,500 total in any one occurrence.

5. **Glass Breakage -- We** do not cover building glass breakage loss for more than $100 for any plate, pane, multiple plate insulating unit, heating pane, jalousie, louver, or shutter, or more than $500 in any one occurrence. These **limits** do not apply to loss by **specified perils** other than vandalism.

6. **Glassware/Fragile Articles -- We** do not cover breakage of fragile articles such as glassware, statuary, porcelains, and bric-a-brac, except as a result of **specified perils** or breakage of building glass. This does not apply to glass that is a part of a building or structure; bottles or other containers held for sale; or lenses of photographic and scientific instruments.

7. **Gutters and Downspouts -- We** do not cover loss to gutters and downspouts caused by the weight of ice, sleet, or snow.

8. **Interior of Buildings -- We** do not cover loss to the interior of buildings or structures or to personal property in the buildings or structures caused by rain, snow, sleet, ice, sand, or dust, unless:

   a. entering through openings made by a **specified peril;** or

   b. the loss is caused by the thawing of snow, sleet, or ice on the building or structure.

9. **Jewelry, Watches, Jewels, Pearls, Precious Stones, and Metals -- We** do not cover more than $2,500 total in any one occurrence for loss by theft of jewelry; watches; watch movements; jewels; pearls; precious or semi-precious stones; gold, silver, or other precious metals; or items consisting primarily of precious metals. This limitation does not apply to items of jewelry or watches worth $100 or less.

10. **Machinery, Tools, and Equipment -- We** do not cover builders' machinery, tools, and equipment owned by **you** or in **your** care, while away from the described premises except as a result of **specified perils** or breakage of building glass.

11. **Missing Property -- We** do not cover missing property where the only proof of loss is unexplained or mysterious disappearance, or shortage discovered on taking inventory, or other instance where there is no physical evidence to show what happened to the property.

12. **Patterns, Dies, Molds, Models, and Forms -- We** do not cover more than $2,500 total in one occurrence for loss by theft to patterns, dies, molds, models, or forms.

13. **Personal Property in the Open -- We** do not cover loss to personal property in the open caused by rain, snow, ice, or sleet.

14. **Stamps, Tickets, Letters of Credit -- We** do not cover more than $250 total in any one occurrence for loss by theft to stamps, tickets (including lottery tickets held for sale), or letters of credit.

15. **Transferred Property -- We** do not cover loss to property that has been transferred to a person or to a place away from the described premises on the basis of unauthorized instructions.

16. **Valuable Papers and Records -- We** do not cover loss to valuable papers or records except by **specified perils** or breakage of building glass. This applies to account books, bills, card index systems, electronic data processing media and the information on such media, deeds, drawings, evidence of debt, manuscripts, and other records.

## ADDITIONAL COVERAGES

1. **Collapse -- We** pay for loss caused by direct physical loss involving collapse of a building or structure or any part of a building or structure caused only by one or more of the following:

   a. **specified perils;** all only as covered in the Commercial Property Coverage;

   b. hidden decay;

   c. hidden insect or vermin damage;

   d. weight of people or business personal property;

   e. weight of rain that collects on a roof; or

   f. the use of defective material or methods in construction, remodeling, or renovation if the collapse occurs during the course of the construction, remodeling, or renovation.

If otherwise covered under the Commercial Property Coverage, under items a. through f. above, we do not pay for loss to the following types of property unless the loss is a direct result of the collapse of a building or structure:

outdoor radio, television, satellite, dish-type, or other antennas including their masts, towers, and lead-in wiring; outdoor awnings or canopies or their supports; fences; gutters and downspouts; yard fixtures; outdoor swimming pools; piers, wharves, and docks; beach or diving platforms or appurtenances; retaining walls; foundations; walks, roadways, and other paved surfaces.

Collapse does not include settling, cracking, shrinking, bulging, or expanding.

This does not increase the **limit**.

2. **Tearing Out and Replacing --** When loss caused by:

a. water;

b. other liquids;

c. powder; or

d. molten material

is covered, **we** also pay the cost of tearing out and replacing any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

**We** do not pay for damage to the system or appliance from which the water or other substance escapes. However, **we** pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage results in discharge of any substance from an automatic fire protection system; or is directly caused by freezing.

# GENERAL CONDITIONS PART
## CRIME COVERAGE

Unless stated otherwise in any Crime Coverage Part, "declarations", or endorsement, the following General Conditions apply to all Crime Coverage forms forming a part of this policy.

## DEFINITIONS

The defined words and phrases have special meanings. These words and phrases are shown in quotation marks.

1. "You" and "your" mean the persons or organizations named as the insured on the "declarations".

2. "We", "us", and "our" mean the company providing this coverage.

3. "Basic territory" means the United States of America, its territories and possessions, Canada, and Puerto Rico.

4. "Declarations" means all pages labeled Declarations, Supplemental Declarations, or Schedules, which pertain to this coverage.

5. "Limit" means the amount of coverage that applies.

6. "Money" means currency, coins, and bank notes in current use; travelers checks; registered checks; and money orders held for sale to the public.

7. "Property other than money and securities" means any tangible property other than "money" and "securities" that has intrinsic value and is not otherwise excluded.

8. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or other property. This includes tokens, tickets, revenue, or other stamps (whether represented by actual stamps or unused value in a meter) in current use and evidences of debt used in connection with

credit cards (which are not issued by "you"), but does not include "money".

9. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

## COVERAGES

See the Crime Coverage Parts sections for Property Covered, Property Not Covered, and Perils Covered.

## EXCLUSIONS

See the Exclusions section in the Coverage Parts.

## VALUATION

The following provisions apply:

1. **Money** -- The value of "money" is based on its face value.

2. **Property Other Than Money and Securities** -- The value of "property other than money and securities" is based on its actual cash value at the time the loss is discovered, with a deduction for depreciation. The valuation is limited to the cost to repair or replace with property of equivalent kind and quality, to the extent practicable.

3. **Securities** -- The value of "securities" is based on their actual cash value at the close of business on the business day immediately preceding the day on which the loss is discovered.

AAIS
CR 0100 06 99
Page 2 of 6

## WHAT YOU MUST DO
## IN CASE OF LOSS

1. **Abandonment of Property --** In case of loss, "we" do not have to accept any abandonment of property.

2. **Cooperation --** In case of loss, "you" must cooperate in performing all acts required by this coverage.

3. **Damaged Property --** In case of loss, "you" must exhibit the damaged property as often as "we" reasonably request.

4. **Examination --** Any insured must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Notice --** In case of loss, "you" must promptly notify "us" or "our" agent (in writing if requested). "You" must notify the police if the loss is a result of a violation of the law.

6. **Proof of Loss --** In case of loss, "you" must send "us" a signed proof of loss (under oath, if requested) containing the information that "we" request, within 120 days after the loss.

7. **Protect Property --** In case of loss, "you" must take all reasonable steps to protect the covered property from further damage.

8. **Records --** In case of loss, "you" must produce records, including tax returns and bank microfilms of all cancelled checks, relating to value, loss and expense; and permit copies and extracts to be made of them as often as "we" reasonably request.

9. **Volunteer Payments --** In case of loss, "you" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

## LOSS PAYMENT

The Loss payment is determined based upon the Valuation "terms" and all of the following provisions, subject to all of the "terms" of Crime Coverage Parts.

1. **Benefit To Others --** Insurance provided by this coverage will not directly or indirectly benefit anyone having custody of "your" property.

2. **Deductible --** In any one "occurrence", "we" pay only that part of "your" loss over the deductible amount stated on the "declarations". If more than one deductible could apply, only the largest deductible amount will apply.

3. **Insurable Interest --** "We" cover property owned by "you" or for which "you" are legally liable. "We" do not cover more than "your" insurable interest in any property.

4. **Insurance Under More Than One Coverage --** If more than one coverage of this policy applies to the same loss, "we" pay no more than the lesser of:

   a. the actual loss or damage; or

   b. the sum of the "limits" that apply to those coverages.

5. **Limit of Insurance --** The most "we" will pay for loss in any one "occurrence" is the applicable "limit" shown on the "declarations".

   The applicable "limit" does not accumulate from year to year or from policy period to policy period, regardless of the number of years or policy periods during which coverage has been in effect or the number of premiums that are payable or have been paid.

AAIS
CR 0100 06 99
Page 3 of 6

6. **Notice** -- "We" must give "you" notice of "our" intent to repair or replace the lost or damaged property within 30 days after receipt of a duly executed proof of loss.

7. **Other Insurance** -- "We" do not cover loss that can be collected under any other insurance or other type of coverage. However, if the loss exceeds the "limit" that applies under the other insurance or other type of coverage, this coverage will apply to the portion of the loss that exceeds the "limit" under the other insurance or other type of coverage.

   The coverage provided by this condition cannot be applied to cover any deductible amount that applies under the other insurance or other type of coverage. "We" will not pay more under this condition than the applicable "limit" for this coverage.

8. **Our Options** -- "We" have the following options:

   a. For loss to "money" issued in a country other than the United States of America, "we" pay the face value in "money" issued by that country or in an equivalent amount in United States dollars as determined by the rate of exchange at the close of business on the business day immediately preceding the day on which the loss is discovered.

   b. For the loss of "securities", "we" may pay:

      1) the value of such "securities" or replace them with the same kind of "securities". If "we" do so, "you" must assign to "us" all "your" rights, titles, and interest in and to the lost or damaged "securities"; or

      2) the cost of any Lost Securities Bond required for issuing duplicates of the lost or damaged "securities". "We" will not pay more for the cost of the bond than the cost of the bond with a penalty that does not exceed:

         a) the value of the "securities" at the close of business on the business day immediately preceding the day on which the loss is discovered; or

         b) the applicable "limit",

      whichever is less.

   c. "We" pay for loss or damage to "property other than money and securities", including building damage, at the actual cash value of the property or we pay the cost to repair or replace it.

      If "you" and "we" do not agree on the amount of the loss or the actual cash value of covered property, either party may demand that these amounts be determined by arbitration.

      "We" may take all or any part of the damaged property at the agreed or arbitrated value.

      Any property paid for or replaced will become "our" property.

   d. "We" pay for loss or damage to "property other than money and securities" in the "money" issued by the country where the loss occurred or in an equivalent amount in United States dollars as determined by the rate of exchange at the close of business on the day immediately preceding the day on which the loss is discovered.

9. **Property of Others** -- Losses to property of others may be adjusted with "you". "We" reserve the right to adjust with and pay to the owners. Payment to the owners satisfies "our" obligation to "you" for loss to this property. "We" may also choose to defend any suits arising from the owners.

10. **Your Losses** -- "We" adjust all losses with "you". Payment is made to "you" unless another loss payee is named in the policy. An insured loss will be payable 30 days after a satisfactory proof of loss is received, and the amount of the loss has been established either by written agreement with "you" or by the filing of an arbitration award with "us".



AOL | Mail Toolbar | Make AOL My Home Page

cind...

C...

Se...                              ...rch the Web

Ma...                    ...ply | Reply All | Forward ...Mark Unread   Actions
                              Delete | Spam

Ne...                    ...d: Cindy & CT Lee
                   From: Bryan Finnicum <generalinsuranceadjusting@gmail.com>
Old Mail             To: cindyleemd <cindyleemd@aol.com>
                   Date: Fri, Mar 1, 2013 10:06 am
**Drafts (3)**

Sent
                   ---------- Forwarded message ----------
**Spam (181)**     From: **Bryan Finnicum** <generalinsuranceadjusting@gmail.com>
                   Date: Wed, Feb 27, 2013 at 3:23 PM
Recently Deleted   Subject: Cindy & CT Lee
                   To: claimnet@in-motion.net
Saved Chats        Cc: cindyleemd@aol.com

Contacts
                   ...Hester
                   ...e Mutual Casualty Company
                   ...t
                   ..., IN 46052

                   ...D:                          Cindy & CT Lee
                   ...OCATION:                     500 Williams St
                                                   Cincinnati, Ohio 45215
                                                   10/5/2012
                   ...NCE COMPANY:                 Goodville Mutual Casualty
                   ...y
                   ...NUMBER:                      SM923823

                   ...nis Hester:

                   I am writing regarding our telephone conversation today.  I had
                   called to get an update on the progress of this claim, as there has
                   been some confusion as to the policy language.  You explained
                   that you had spoken to Mr. Glen Hess with Goodville Mutual after

my telephone conversation with him on February 15, 2013. You explained that no decision has been made as to the policy language interpretation. This delay on your and Goodville Mutual Casualty Company's part to interpret its own policy presents an unjustified delay in the paying of this claim.

The language of this policy is clear. The options for settlement, as outlined under the title Valuation item 1, defines Actual Cash Value as:

> Actual Cash Value – When replacement cost is not shown on the **declarations** for covered property, the value is based on the actual cash value at the time of the loss (with deduction for depreciation), except as provided in paragraphs 2 through 9 below.

Item 9 defines Replacement Cost as:

> Replacement Cost – When replacement cost is shown on the **declarations** for covered property, the value is based on replacement cost without any deduction for depreciation...You may make claim for actual cash value before repair or replacement takes place, and later for the replacement cost if you notify us of your intent within 180 days after the loss.

The policy defines Actual Cash Value and does not mention the use of market value. Replacement Cost is without any deduction for depreciation and Actual Cash Value is Replacement Cost with deduction for depreciation.

On December 24th you sent to the insured a letter outlining your assessment of the claim. Market Value was the foundation of your settlement calculation. On December 27th I contacted you taking exception to your basis for the settlement offer. You assured me your offer was consistent with policy language and that Market Value is the policy definition of Actual Cash Value. Your assurance was a deceptive misrepresentation of coverage. By adopting unduly restrictive policy interpretations you are defeating coverage in excess of $400,000.

I mailed to you on November 16th 2012, a detailed building estimate. You confirmed receipt of that estimate on the 3rd of December. That estimate is a one hundred and eight page detailed estimate of damage. The estimate reflects the cost to repair and/or replace the damaged property with material of like

kind and quality. The estimate reflects the Replacement Cost damage as defined in the policy. You have rejected that estimate based on the total value of the estimate without regard to itemized content. I have requested to meet to review the estimate on November 19th, December 27th, January 10th, and February 27th. You have refused to meet to resolve this claim on every occasion. You have stated that you have a contractor's estimate that supports a lower cost for repairs. I have requested that you provide me with a copy of the estimate and you have refused. You have demonstrated a failure to evaluate the claim objectively and unreasonably disputed the value of the loss.

You have repeatedly made abusive comments and unfounded accusations regarding my client. On November 19th you stated that there was a meth lab in the unit that caught fire. You also stated that the insured was aware of the lab and did nothing to stop it. You explained that you are a private investigator, that you know fraud when you see it, and that "this looks like fraud." You also said that I should not trust anything the insured says to me, that she is a "liar." I feel your objectivity is in question and that has resulted in your mishandling of this claim.

You and Goodville Mutual Casualty Company have continually demonstrated a clear case of bad faith in claims handling. I suggest that you settle this claim based on the repair estimate I have submitted. You may also contact me with reasonable justification that includes conditions within the policy to explain why you feel that the insured is not entitled to the value demonstrated in my estimate. As I have requested, I am willing to meet with you to review and adjust this claim.

Respectfully,

General Insurance Adjusting Co.

D. Bryan Finnicum

Bryan Finnicum
General Insurance Adjusting Co.
4450 Belden Village St NW
Suite 201
Canton, Ohio 44718

ELECTRONICALLY FILED 11/06/2014 14:00 / IFIJ / A 1406566 / CONFIRMATION NUMBER 372036                    7/17/2013 12:13 PM